THE STATE OF ILLINOIS, Appellant, vs. THE ILLINOIS CEN-
TRAL RAILROAD COMPANY, Appellee.

*Opinion filed October 28, 1910.*

1. TAXES—*revenue provided under charter of Illinois Central·is in lieu of ordinary taxes.* All of the revenue provided under the charter of the Illinois Central Railroad Company is based on contract and is in lieu of and intended as a fair equivalent for ordinary taxes, and the provisions of the charter in regard thereto are constitutional and are binding upon the State and the company.

2. SAME—*provision of the Illinois Central charter concerning "gross" receipts includes receipts from inter-State traffic.* The provision of the charter of the Illinois Central Railroad Company requiring the company to pay to the State a percentum of the "gross or total proceeds, receipts or income derived from said road and branches," includes the receipts and income derived from the transportation of inter-State shipments over the company's charter lines.

3. SAME—*revenue provision of Illinois Central charter is not an attempt to regulate inter-State commerce.* The provisions of the Illinois Central Railroad Company's charter relating to the revenue to be paid to the State were intended as a fair method of fixing an equivalent for a tax that would otherwise ordinarily be levied on the property of the company, and were in no sense an attempt to regulate or impose a tax on inter-State commerce.

4. SAME—*revenue provision of Illinois Central charter is not in violation of inter-State commerce provision of Federal constitution.* In granting the charter to the Illinois Central Railroad Company the State had power to provide, in advance of granting its charter, that the company, if it accepted the benefits of such charter, must pay a percentum of its gross receipts, including those from inter-State traffic, as an equivalent for ordinary taxes; and such provision is not an attempt to regulate inter-State commerce, in violation· of the Federal constitution.

5. ACCOUNTING—*word "account" has no clearly defined legal meaning.* An "account" is some matter of debt or credit, or of a demand in the nature of a credit, between parties, arising out of a contract or fiduciary relation or from some duty imposed by law, and it is not required to be in any particular form nor to contain detailed information.

6. SAME—*a party having authority to pass upon account may waive right to have it itemized.* A party who has authority to pass upon and settle an account may waive his right to have such account fully itemized.

7. SAME—*Governor may require a reasonable statement of account from Illinois Central.* · Under the provision of the charter of the Illinois Central Railroad Company requiring the company to furnish a copy of the account of proceeds, receipts and income to ·the Governor, the latter may require a reasonable statement of account showing, generally, from what sources such proceeds, receipts and income are obtained, in order to furnish him with such knowledge of the company's affairs as will enable him to pass understandingly on the correctness of the account.

8. SAME—*Governor has power not only to investigate but to settle accounts between Illinois Central and the State.* Under the charter of the Illinois Central Railroad Company the Governor, in passing upon the semi-annual accounts rendered by the company to the State, must be held to have power not only to investigate the accounts, but to correct them and finally adjust, audit and settle them, and in so doing he is not exercising judicial power nor changing the charter contract, in violation of the constitution.

9. SAME—*binding force of Governor's action in passing upon semi-annual accounts of Illinois Central.* The action of the Governor in passing upon and approving the semi-annual accounts rendered by the Illinois Central Railroad Company to the State is not an adjudication but amounts to an adjustment or striking a balance, and his decision can be reviewed by the courts only for fraud, accident or mistake.

10. SAME—*rule of estoppel does not apply to charter contract between Illinois Central and the State.* In enforcing the charter contract between the State and the Illinois Central Railroad Company the State acts in its governmental and not in its private capacity, and is not estopped by lapse of time from inquiring into the correctness of the semi-annual accounts rendered to it by the company, where there are no special circumstances requiring the doctrine of equitable estoppel to be applied.

11. SAME—*pleading—bill for accounting must state plain case.* A bill for accounting must state a plain case, but the degree of certainty required depends somewhat upon the character of the accounts involved, and need only be such as to apprise the defendant of the matters for which he will be called upon to account.

12. SAME—*precise allegations are not required where matters rest within defendant's knowledge.* If matters essential to the determination of the complainant's claims are alleged to rest within the knowledge of the defendant alone, or must, of necessity, be within the defendant's knowledge, and are the subject of a part of the discovery sought by the bill, precise allegations are not re-

quired, and it is sufficient if general statements of fact are made, under which pertinent details can be proved.

13. SAME—*what must be charged by party seeking to open an account stated.* A stated or settled account is an acknowledgment of an existing condition of liability of the parties from which the law implies a promise to pay the balance thus acknowledged to be due, and one who seeks the aid of a court of equity to open up a stated or settled account must charge fraud or state particular errors, and the allegations must be definite and reasonably certain.

14. SAME—*mistakes or errors must be specifically alleged.* In order to open a stated account the bill must either charge fraud specifically or must point out particularly the mistakes and errors relied upon; and this rule applies whether the parties are dealing at arm's length or occupy confidential relations.

15. SAME—*what is not sufficient averment to justify opening stated account for fraud.* Allegations that an account stated was falsely and fraudulently made and was incorrect, and that the defendant knew that fact at the time the statement of account was rendered, are not such averments of fact as justify opening the account on the charge of fraud.

16. SAME—*when account may be regarded as an account stated.* In ordinary business transactions, if an account is transmitted from one party to another and no objection is made thereto within a reasonable time the account will be deemed a stated account by reason of the presumed acquiescence or approbation of the parties.

17. SAME—*when a defendant cannot complain that bill is not sufficiently specific.* A different rule of pleading applies where a bill is filed to open a stated account and where it is filed to compel an accounting, and in the latter case, if the books and accounts in question are in the sole possession of the defendant, the latter can not complain that the bill does not specifically set out the items of account claimed by the complainant to be incorrect.

18. ILLINOIS CENTRAL RAILROAD—*semi-annual statements rendered by Illinois Central prior to 1905 are stated accounts.* The semi-annual statements rendered by the Illinois Central Railroad Company to the State prior to the year 1905 must be held to be stated accounts, as each Governor of the State had authority to obtain the necessary information to ascertain the accuracy of such statements, and it must be presumed that each Governor did his duty and made the necessary examination.

19. SAME—*what does not overcome presumption that the Governor performed his duty in examining account.* The presumption that each Governor of the State performed his duty in examining

the semi-annual statements rendered by the Illinois Central Railroad Company and ascertained their accuracy is not overcome by allegations in a bill by the State to open up such accounts that the Governor made no examination of the company's books of account, nor by the claim of the State that some of the statements show, on their face, that the Governor did not have time to examine the statements before approving them.

20. SAME—*bill of State against Illinois Central is not sufficient to justify opening accounts prior to 1905.*  In view of the fact that the semi-annual statements rendered prior to the year 1905 by the Illinois Central Railroad Company to the State of Illinois must be held to be stated accounts, the bill filed in this case by the State to compel an accounting from the company must be held to be insufficient to justify a court of equity in opening up and inquiring into the semi-annual statements for the years in question.

21. SAME—*obligation rests upon Illinois Central to make true accounts to State.*  The relation existing between the State and the Illinois Central Railroad Company under the latter's charter, while not strictly a fiduciary one, is of such a nature as to compel the State to repose confidence in the integrity of the company, and to require the latter, in rendering its semi-annual statements, to make true and accurate statements of its gross receipts, and to prove their truth and accuracy when they are questioned by the Governor, acting for the State.

22. SAME—*the bill in this case is sufficient to require accounting from Illinois Central for years 1905 and 1906.*  Under the present state of the pleadings the bill in this case must be held to be sufficient to require an accounting to the State by the Illinois Central Railroad Company for the years 1905 and 1906 with reference to the semi-annual statements of gross proceeds, receipts and income rendered by the company for such period, and the burden is upon the company to establish the truth and accuracy of such statements in so far as they are sufficiently questioned by the bill.

23. SAME—*rule for dividing joint traffic earnings—what must be considered.*  In determining what is a fair division of joint traffic earnings between the charter and non-charter lines of the Illinois Central Railroad Company all factors must be considered which experience has shown are necessary to be considered in order to reach a fair division, and the mileage basis is not necessarily the only fair and equitable basis.

24. SAME—*when mileage basis may be used as a basis for dividing joint traffic earnings.*  In determining what is a fair and equitable division of joint traffic earnings between the charter and non-charter lines of the Illinois Central Railroad Company, if the

State, on the hearing in this case, shall prove that certain charges were made for carrying goods partly over the charter lines and partly over the non-charter lines, the court, in the absence of any other proof on that point, may divide such joint charges, *pro rata,* according to the length of the carriage over the respective lines.

25. SAME—*State cannot compel repudiation of contracts with other roads in making a division of joint traffic earnings.* If the proper officials of the Illinois Central Railroad Company have in good faith entered into contracts with other railroads as to joint traffic earnings between such companies and itself, the State can not in this proceeding arbitrarily require the repudiation of such contracts, in a division of joint earnings between such companies, in order to fix the amount of the State's percentum.

26. SAME—*railroad company has burden of showing that division of joint earnings has been fair.* The allegations of the bill in this case are sufficient to require an accounting by the Illinois Central Railroad Company as to the division of joint traffic earnings between the charter and non-charter lines of the company for the years 1905 and 1906, and the burden of proof is on the company to show that the division which has been made is fair and equitable for the fixing of the State's percentum, to which it is entitled under the provisions of the company's charter.

27. SAME—*a division of express earnings is governed by rules for dividing joint traffic earnings.* The allegations of the bill in this case are sufficient to require an accounting by the defendant company with respect to the division of express earnings between its charter and non-charter lines for the years 1905 and 1906, and on the hearing the same rules will apply to the division of such express earnings as will govern the division of the joint traffic earnings.

28. SAME—*right of State to accounting for drayage and switching charges.* The allegations of the bill in this case are sufficient to require an accounting from the defendant company for drayage and switching charges for the years 1905 and 1906, but as the State is entitled to receive its percentum only upon the "gross or total proceeds, receipts or income derived from said road and branches," if it shall appear that the charges for drayage and switching are earnings accruing to other companies for distinct and independent services performed by them, (even though collected by appellee along with its own charges,) they cannot be considered as part of such gross receipts.

29. SAME—*Illinois Central cannot lessen gross receipts by free traffic arrangements.* The Illinois Central Railroad Company has authority, acting in good faith, to make traffic arrangements be-

tween the charter and non-charter lines, or with other companies, for the use of its equipment, terminal facilities, depots, etc., but it cannot, in doing so, lessen the gross proceeds and receipts upon which the State's percentum is computed.

30. SAME—*charter and non-charter lines must be treated as independent lines for all purposes.* In ascertaining the gross proceeds or receipts of the charter lines of the Illinois Central Railroad Company such lines must be treated as separate and distinct from the non-charter lines, not only in the matter of dividing joint earnings, but in the payment of operating expenses as well.

31. SAME—*"gross receipts" means total receipts, without deductions.* The term "gross receipts," used in the charter of the Illinois Central Railroad Company as the basis for computing the State's percentum to be paid by the company, was intended to mean the total receipts received by the charter lines of the company before anything is deducted for the expenses of management.

32. SAME—*charter lines must be credited with fair remuneration for services performed for the non-charter lines.* The Illinois Central Railroad Company must, under its charter, pay the State's percentum upon the total proceeds,—not only the proceeds actually received, but those that should be credited to the charter lines as a fair remuneration for the services they are performing for the non-charter lines in granting them the free use of terminal facilities and equipment, and for all other services which they have furnished free to the non-charter lines.

33. SAME—*operation of dining cars and eating houses is within the powers of the Illinois Central.* The operation of dining cars and eating houses for the use of charter line patrons is necessarily incident to the business of the Illinois Central Railroad Company and is therefore within its powers, and the receipts from such dining cars and eating houses, so far as derived from patrons of the charter lines, should be included in the total receipts for computing the State's percentum.

34. SAME—*the value of free mileage books used on charter lines must be included in the total receipts.* The value of mileage books issued by the Illinois Central Railroad Company in payment for advertising and printing, and used on the charter lines, must, under the allegations of the bill in this case, be included in the total receipts upon which the State's percentum is to be computed.

35. SAME—*rule as to rentals received from other companies for use of cars.* If, on the hearing in this case, it is shown that there has been an interchange of cars between the charter lines of the defendant company and other railroads, then up to the point where the amounts balance there is a mere exchange of the use of cars;

but if the defendant company receives from any company rental for the use of its cars in excess of the amount paid out by it, then such excess should be made a part of the receipts by which to measure the State's percentum.

36. SAME—*charter lines must be credited with their hauls on shipments by Cairo and Mounds.* On the hearing of this case the defendant company should be required to account, on a just and equitable basis, 'for the nine-mile haul over the charter lines on shipments from south of the Ohio river destined for St. Louis and billed to Mounds, and for the five-mile haul over the charter lines from Cairo Junction to Cairo on shipments from points south of the Ohio river destined for Cairo.

37. SAME—*lawful rebates should not be included in gross receipts.* Under the allegations of this bill that the defendant company has defrauded the State by allowing certain patrons rebates as fictitious claims, which have been deducted from the charter line receipts, it is incumbent upon the defendant company to show whether such rebates were lawful, and if they were, and the agreements on which they were based were entered into in good faith, they should not be included in the gross receipts.

38. SAME—*interest on deposits or loans of charter line funds is not intended to be included in total receipts.* The interest received by the Illinois Central Railroad Company on deposits or loans of the charter line funds was not intended to be included in the total receipts derived from said charter lines and branches for measuring the State's percentum.

39. SAME—*claim that Illinois Central has diverted traffic to reduce charter line receipts cannot be sustained.* The claim of the State in this case that the defendant company has diverted freight from charter lines to non-charter lines for the purpose of reducing the gross receipts of the charter lines cannot be sustained, as the defendant company has the right, in the management of its business, to ship goods over any line of its railroad.

40. SAME—*deduction of bridge arbitraries for use of Cairo and Dubuque bridges is not unlawful.* The deduction of bridge arbitraries by the Illinois Central Railroad Company for carrying traffic across the Cairo and Dubuque bridges is not unlawful, but the company must show that the charge made would be a fair and reasonable one if the bridges were owned by independent companies, and that it was made in good faith. ·

41. SAME—*right of State to recover percentum on Cairo bridge arbitrary.* If, on the hearing of this case, the defendant company shows that the Cairo bridge arbitrary is a charge made in good faith for traffic over that part of the bridge and approach which is

in Kentucky and that such charge is reasonable, then the State is not entitled to recover a percentum on such bridge arbitrary; but if it is shown that the charge is made, in part, for carrying traffic over the approach in Illinois, then the State is entitled to a percentum on a part of such arbitrary, the division to be on a fair and equitable basis; and the burden is on the defendant company to show the exact situation as to such arbitraries.

42. SAME—*Illinois Central must act toward the State in utmost good faith.* The relations of the State and the Illinois Central Railroad Company under the latter's charter are such as to require that the company, in reporting its gross receipts to the State as the basis for computing the State's percentum, should act in the utmost good faith, and in this litigation the company must furnish the information called for by the interrogatories attached to the bill, in so far as they are germane to the accounting herein required.

43. SAME—*State is not bound by contemporaneous construction of charter.* The doctrine of contemporaneous construction has no application to provisions of the charter of the Illinois Central Railroad Company which are plain and unambiguous, and, as to other provisions, the mere fact that in the past certain practices were followed in the matter of dividing joint traffic earnings, etc., does not bind the State to continue such practices under conditions which have radically changed since the methods of division were adopted.

HAND, J., specially concurring; FARMER, J., VICKERS, C. J., and COOKE, J., also specially concurring.

APPEAL from the Circuit Court of LaSalle county; the Hon. SAMUEL C. STOUGH, Judge, presiding.

W. H. STEAD, Attorney General, (W. H. BOYS, J. H. WIDMER, and B. F. LINCOLN, of counsel,) for the State.

W. S. HORTON, J. M. DICKINSON, and W. D. FULLERTON, (BLEWETT LEE, of counsel,) for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a suit for an accounting, brought by the State of Illinois against the Illinois Central Railroad Company. The original bill was filed in this court to its February term, 1907. A motion made by appellee to dismiss the

suit for want of jurisdiction was allowed at the April term, 1907, and leave given by the State to withdraw its bill without prejudice. The bill was thereupon filed in the circuit court of LaSalle county to the June term, 1907. Appellee, by motion to dismiss, challenged the right of the Attorney General to bring this suit. Afterwards the motion was withdrawn and July 8, 1907, a demurrer was filed. After argument the State asked and obtained leave to amend the original bill. However, instead of amending, an entirely new bill was filed April 6, 1908, without objection, including interrogatories and exhibits. It will be hereafter called "the bill." August 6, 1908, demurrers were filed thereto. They consist of a general and special demurrer to the bill as a whole, and twenty-eight separate demurrers, both general and special, to its different parts. In November and December, 1908, these demurrers were argued in the circuit court, and June 16, 1909, that court entered a decree sustaining them and dismissing the bill for want of equity. From that decree the State prayed an appeal to this court.

The bill is based on certain provisions of the charter granted to appellee by the State in 1851, and seeks an accounting from October 31, 1877, down to the time of stating the account to be fixed by the court. To understand the questions raised in this case a brief historical review of the legislation which led to the granting of that charter seems necessary.

In 1836 an act was passed to incorporate the "Illinois Central Railroad," to build a railroad commencing near the mouth of the Ohio river and extending north to a point on the Illinois river near the termination of the Illinois and Michigan canal. (Laws of 1835-36, p. 129.) Nothing appears to have been done under this act, and it was repealed February 17, 1851. (Laws of 1851, p. 192.) In 1837 the legislature passed an act for a general system of internal improvement, among other things authorizing the construction of a railroad from Cairo to LaSalle and appropriating

three and one-half million dollars for that purpose. (Laws of 1836-37, p. 121.) After a right of way had been surveyed and acquired and a large amount of money spent the work was abandoned. The legislature in 1843 passed an act to incorporate the Great Western Railway Company, granting it authority to build a line from Cairo to LaSalle and then to Galena. (Laws of 1842-43, p. 199.) The act granted the company all the right of way, land and property acquired by the State under the act of 1837, to be appraised and paid for as provided therein. Nothing was accomplished under that law, and the charter of this company was repealed March 3, 1845. (Laws of 1844-45, p. 253.) Efforts were then made to obtain from the Federal government aid in building the railroad, and on April 13, 1849, the General Assembly re-enacted the former act for the incorporation of said Great Western Railway Company. By this latter act the Governor of the State was authorized to contract with and hold in trust for said Great Western Railway Company whatever lands might be donated to the State to aid in the completion of that railroad. (Private Laws of 1849, p. 89.) Congress, on September 20, 1850, passed an act granting to the State of Illinois a right of way through the public lands and the ownership of every alternate section of land for six miles in width on each side thereof, to aid the State in constructing a railroad from Cairo to LaSalle, with a branch to Chicago and another to Dubuque. The act provided that the lands granted should be subject to the disposal of the legislature of Illinois and be applied to the construction of the said road and branches, and to no other purpose. At the time of this grant by Congress the charter of the Great Western Railway Company was still in force. That company, however, did not undertake the work, but subsequently surrendered its charter on condition that the release of its rights should be accepted by the legislature and a new company organized for the work. This release and the conditions therein

contained were accepted and the acts incorporating the company repealed by the legislature February 17, 1851. (Laws of. 1851, p. 192.) February 10, 1851, the legislature passed an act incorporating the Illinois Central Railroad Company, the appellee in this suit. This act or charter contained twenty-seven sections. It authorized the company to locate, construct and operate a railroad and two branches, the main line to extend from the southern terminus of the Illinois and Michigan canal (near LaSalle) to a point at Cairo, with a branch to Chicago, and another branch, by way of Galena, to a point on the Mississippi river opposite Dubuque, Iowa. The Governor of Illinois was made director *ex-officio,* with power to vote either in person or by proxy. By section 15 of the charter appellee was granted all the lands ceded to the State by the act of Congress of 1850; also depot grounds in the city of Cairo, the right of way and all the improvements made thereon by the Internal' Improvement Commission and the Great Western Railway Company under the acts of 1837. This latter property was in addition to that ceded to the State by the act of Congress of 1850.

The appellee was duly organized, a board of directors elected and the charter accepted March 15, 1851. It thereupon proceeded to lay out and construct the railroad and branches described in the charter. Under the authority conferred by the legislature of the State June 22, 1852, (Laws of 1852, p. 130,) the appellee constructed what is known as the "St. Charles Air Line," extending from its eastern branch in Chicago, near Twelfth street, to the Chicago river. September 26, 1856, appellee completed the construction of its charter lines, the same being 705.5 miles in length. Since that date they have been in continuous operation, and are the only lines which appellee, under its charter and the amendments thereto, was authorized to build and operate. The State of Illinois granted to appellee by this charter 2,595,000 acres of land. In addition to this

appellee was granted so much of the right of way two hundred feet in width and 705.5 miles in length as was owned by the United States or the State at the time the charter was granted.   It appears from certain provisions of the charter that some of this right of way,—just how much is not shown,—was owned by private individuals, and the charter provided for appellee acquiring the right of way through and over this last named property.   As the business of appellee expanded it purchased, built and leased other railroad lines, until at the time of the filing of this bill it was operating about 4400 miles of railroad, known as the "Illinois Central System."   In acquiring these branches and lines of railroad appellee did not act or assume to act under its charter powers, but under and by virtue of additional powers created and conferred by the State through general statutes.   The various lines of railroad owned or operated by appellee at the time this litigation was instituted, both charter and non-charter, are as follows:

### Charter Lines.

|  | Miles. | Miles. |
|---|---|---|
| Chicago, Ill., to Cairo, Ill | 364.73 | |
| Dunleith, Ill., to Branch Junction, Ill | 340.77 | |
| | | 705.50 |

### Non-charter Lines.

| | Miles. |
|---|---|
| Gilman, Ill., to East St. Louis, Ill | 209.06 |
| St. Charles Air Line Junction, Ill., to Freeport, Ill. | 112.14 |
| East St. Louis, Ill., to Murphysboro, Ill | 84.25 |
| Murphysboro, Ill., to Texas Junction, Ill | 1.00 |
| Texas Junction, Ill., to Carbondale, Ill | 7.72 |
| Pekin, Ill., to Decatur, Ill | 67.38 |
| Hervey City, Ill., to Evansville, Ind | 160.22 |
| Pinckneyville, Ill., to Eldorado, Ill | 59.85 |
| Murphysboro, Ill., to Carbondale, Ill | 7.00 |
| Carbondale, Ill., to Brookport, Ill | 70.64 |
| Belleville, Ill., to East Carondelet, Ill | 17.30 |
| Carbondale, Ill., to Johnston City, Ill | 19.15 |
| Texas Junction, Ill., to Gale, Ill | 46.65 |
| Gale, Ill., to Thebes, Ill | 1.67 |
| McClures, Ill., to East Cape Girardeau, Ill | 4.18 |
| Champaign, Ill., to Havana, Ill | 100.58 |

White Heath, Ill., to Decatur, Ill................ 31.04
Otto, Ill., to Normal Junction, Ill................ 79.46
Buckingham, Ill., to Tracy, Ill................... 10.00
Kempton Junction, Ill., to Kankakee Junction, Ill.. 41.80
Reevesville, Ill., to Golconda, Ill................ 17.20
Christopher, Ill., to Herrin Junction, Ill.......... 11.88
Mounds, Ill., to Olive Branch, Ill................ 10.49
Groves, Ill., to Sand Ridge, Ill................... 17.26
Wallace, Ill., to Madison, Wis.................... 61.80
Cedarville Junction, Ill., to Dodgeville, Wis...... 57.36
Mounds, Ill., to Mound City, Ill.................. 2.87
Stewartsville, Ind., to New Harmony, Ind........ 6.33
West Lebanon, Ind., to Leroy, Ill................ 74.43
Sixty-seventh St., Chicago, to South Chicago..... 4.76
Blue Island Junction, Ill., to Blue Island......... 3.96
Kosciusko, Miss., to Aberdeen, Miss.............. 87.89
Winfield, Ala., to Brilliant, Ala.................. 7.84
East Cairo, Ky., to New Orleans, La............547.71
East Cairo, Ky., to Paducah, Ky. ............... 31.89
Aberdeen Junction, Miss., to Kosciusko, Miss..... 18.37
Grenada, Miss., to Memphis, Tenn...............100.00
Louisville, Ky., to Memphis, Tenn................392.21
Cecelia, Ky., to Hodgenville, Ky................. 17.10
Horse Branch, Ky., to Owensboro, Ky............ 42.16
Evansville, Ind., to Princeton, Ky................ 99.84
Gracey, Ky., to Hopkinsville, Ky................ 10.06
Morganfield, Ky., to Uniontown, Ky.............. 6.43
DeKoven, Ky., to Ohio River, Ky................ 1.46
Blackford, Ky., to Dixon, Ky.................... 18.40
Dubuque, Iowa, to Sioux City, Iowa.............326.26
Manchester, Iowa, to Cedar Rapids, Iowa........ 41.85
Onawa, Iowa, to Sioux Falls, S. D..............155.58
Tara, Iowa, to Council Bluffs, Iowa..............133.38
Cedar Falls Junct., Ia., to Glenville Junct., Minn... 94.88
Stacyville Junction, Iowa, to Stacyville, Iowa..... 7.93
Hervey City, Ill., to Decatur, Ill., (half interest). 7.52
Hopkinsville, Ky., to Nashville, Tenn............ 84.64

*Trackage Rights.*

Pekin, Ill., to Peoria, Ill........................ 9.21
Olive Branch, Ill., to Thebes, Ill................ ·9.34
    Total miles operated........................———— 4,377.44

These lines are all located approximately as indicated on the following map:

MAP OF THE

## ILLINOIS CENTRAL RAILROAD SYSTEM

CONSISTING OF

Illinois Charter Lines.
Branch Lines in Illinois.
Dubuque & Sioux City Railroad.
Chicago, Madison & Northern Railroad.
Chicago, St. Louis & New Orleans Railroad and branches south of Ohio River.
Yazoo & Mississippi Valley Railroad.

The chief contention of the parties to this litigation centers about the construction that should be given to sections 18 and 22 of appellee's charter, which read as follows:

"Sec. 18. In consideration of the grants, privileges and franchises herein conferred upon the said company for the purposes aforesaid, the said company shall, on the first Mondays of December and June in each year, pay into the treasury of the State of Illinois five percentum on the gross or total proceeds, receipts or income derived from the said road and branches for the six months then next preceding, the first payment of such percentage on the main trunk of said road to commence four years from the date of said deed of trust, and on the branches six years from the date aforesaid, unless said road and branches are sooner completed, then from the date of completion. And for the purpose of ascertaining the proceeds, receipts or income aforesaid, an accurate account shall be kept by said company, a copy whereof shall be furnished to the Governor of the State of Illinois, the truth of which account shall be verified by the affidavits of the treasurer and secretary of such company. And for the purpose of verifying and ascertaining the accuracy of such account, full power is hereby vested in the Governor of the State of Illinois, or any other person by law appointed, to examine the books and papers of said corporation, and to examine, under oath, the officers, agents and employees of said company, and other persons; and if any person so examined by the Governor or other authority shall knowingly and willfully swear falsely, or if the officers making such affidavits shall knowingly and willfully swear falsely, every such person shall be subject to the pains and penalties of perjury."

"Sec. 22. The lands selected under said act of Congress, and hereby authorized to be conveyed, shall be exempt from all taxation under the laws of this State until sold and conveyed by said corporation or trustees, and the other stock, property and effects of said company shall be

in like manner exempt from taxation for the term of six years from the passage of this act. After the expiration of six years, the stock, property and assets belonging to said company shall be listed by the president, secretary or other officer with the Auditor of State, and an annual tax for State purposes shall be assessed by the Auditor upon all the property and assets, of every name, kind and description, belonging to said corporation. Whenever the taxes levied for State purposes shall exceed three-fourths of one per cent per annum, such excess shall be deducted from the gross proceeds or income herein required to be paid by said corporation to the State, and the said corporation is hereby exempted from all taxation of every kind, except as herein provided for. The revenue arising from said taxation, and the said five per cent of gross or total proceeds, receipts or income aforesaid, shall be paid into the State treasury in money and applied to the payment of interest-paying State indebtedness until the extinction thereof: *Provided,* in case the five per cent provided to be paid into the State treasury and the State taxes to be paid by the corporation do not amount to seven per cent of the gross or total proceeds, receipts or income, then said company shall pay into the State treasury the difference, so as to make the whole amount paid equal at least to seven per cent of the gross receipts of said corporation."

The bill alleges that from 1859, to and including 1904, appellee did not list its property with the Auditor, as provided for in section 22 of its charter; that the Auditor did not require said property to be listed and did not assess the State tax thereon in any of said years; that during all of those years appellee paid no State tax on any of its property, but did pay the State seven per cent of what the company claimed were the gross receipts of its charter lines; that in the years 1905 and 1906 appellee listed its property with the Auditor for taxation; that the Auditor assessed the State tax thereon; that the tax so assessed,

together with the five percentum, did not amount to seven per cent of the gross receipts from its charter lines as claimed and reported by it. The bill further alleges that from October 31, 1877, down to and including 1906, appellee should have paid seven per cent on the gross or total proceeds, receipts or income derived from the charter lines and branches, including receipts from its charter lines from traffic which originated or terminated on the non-charter lines and other lines of transportation and carried in part on the charter lines, but that it has failed to properly account for said proceeds, receipts or income; that it has not properly accounted, since October 31, 1877, for the receipts from express companies or from hotels, eating houses and dining cars operated in connection with such road or for receipts from traffic across the bridges at Cairo and Dubuque; that in computing the gross proceeds upon which the seven per cent should be paid to the State appellee did not make a proper division of the joint earnings between its charter and non-charter lines; that it has improperly allowed the free use of charter line property and charter line services for the benefit of its non-charter lines; that it has not made a proper return as to draying and switching charges and as to newspaper advertising, and in various other ways has failed to make proper statements and returns as to the proceeds upon which it should have paid the seven per cent to the State. No attempt will be made to set out at length the allegations of the bill.

According to the semi-annual statements made up by appellee and given to the State, from 1877 to 1906, inclusive, it appears that seven per cent on the gross proceeds for the half year ending April 30, 1878, was $151,229.54, and that the amounts turned over semi-annually have gradually increased from that date until the six months ending October 31, 1906, when it was $600,102.55.

The demurrers raise many objections, both as to the substance and form of the bill. These objections have been

argued at length in the briefs of counsel. We shall not consider them in detail now, but will dispose of those we deem it necessary to decide in connection with the points hereafter considered.

Three principal contentions are urged: First, that the bill is bad because it seeks to recover an amount equal to seven percentum of the gross proceeds of the charter lines without the State tax having been first levied and collected, prior to the year 1905, on the property of the company, as required by section 22 of its charter; second, that the bill is erroneous because it is drawn upon the theory that the receipts from inter-State commerce must be included; and third, that the allegations of the bill show that the semi-annual statements made by appellee to the State are stated accounts, and that the bill has alleged no facts showing that in equity such accounts should be opened. These questions will be taken up and considered in the order just stated.

### Tax Question.

The State contends that the revenue required to be paid to the State under this charter is all based upon a contractual relation between the State and appellee, and that the State tax provided for in said charter is not any more a tax, in the strict sense of the term, than is the remainder of the amount necessary to make up seven per cent on the gross proceeds of appellee. On the other hand, it is contended by counsel for appellee that the State tax provided for in said charter, although growing out of a contract, is a tax in the strict sense of the word.

This court has held that this charter formed a contract between the State and the company. (*Neustadt* v. *Illinois Central Railroad Co.* 31 Ill. 484; *Illinois Central Railroad Co.* v. *Irvin,* 72 id. 452; *Illinois Central Railroad Co.* v. *Goodwin,* 94 id. 262.) It has also been held that the provisions of this charter with reference to the revenue to be paid the State are constitutional and binding. (*Illinois*

*Central Railroad Co.* v. *County of McLean,* 17 Ill. 291;
*State* v. *Illinois Central Railroad Co.* 27 id. 64.)    In *State
Board of Equalization* v. *People,* 229 Ill. 430, this court
held that the provisions of the charter for the payment of
this revenue was "a substituted method of taxation" in the
nature of a commutation of taxes.   Some of the other de-
cisions just cited in effect hold the same.   The right to tax
is of necessity inherent in every government.   With us it
is vested in the legislature, which possesses plenary power
over the subject, except so far as it may be restricted by
the constitution of the State or United States.   (*Porter* v.
*Rockford, Rock Island and St. Louis Railroad Co.* 76 Ill.
561; 1 Desty on Taxation, 88.)    A contract of exemption
from taxation is generally upheld.   The State may com-
mute a tax by recovering therefor a percentage of receipts,
or something similar, on the basis that it is a fair equiva-
lent for what the customary taxes would be.    (2 Cooley on
Taxation,—3d ed.—p. 110; 1 Desty on Taxation, p. 145;
Judson on the Power of Taxation, p. 68; *Mobile and Ohio
Railroad Co.* v. *Tennessee,* 153 U. S. 486; *State Board
of Assessors* v. *M. & E. Railroad Co.* 49 N. J. L. 193;
*Stearns* v. *Minnesota,* 179 U. S. 223.)    The authorities
have not always carefully distinguished between the word
"tax" as applied to an ordinary tax and as applied to a
payment in lieu of taxes.·   Indeed, it is frequently neces-
sary to decide in which way the word is used, from its con-
nection.   The payment of a percentage of the receipts from
a railroad, thus exempting its property from the ordinary
burdens of taxation, is usually spoken of as a tax.   It is
properly so in the general use of the word, since the sum
goes into the public funds to meet the public expenses.   In
the recent case of *Powers* v. *Detroit, G. H. & M. Railway
Co.* 201 U. S. 543, the court, in considering such a law,
characterized the exaction as a "tax," and while it was
there held that the obligation upon which it was based was
contractual, the opinion used the word "tax" substantially as

if dealing with taxes in the ordinary sense. Contracts exempting property from ordinary taxation or releasing such property for an equivalent are properly treated, as, indeed, they usually are, under the subject of taxation. Such contracts are a special form of tax. While they may, to a greater or less degree, have an element of compulsion somewhat similar to ordinary taxes, yet the sovereign authority may bestow them with or without conditions, and the corporations with whom they are made are at liberty to accept or reject the terms proposed. (*State* v. *Railway Co.* 128 Wis. 449.) Beyond question all of the revenue provided under this charter is based on a contract and in lieu of and intended as a fair equivalent for ordinary taxes. It is on this ground that these provisions of the charter with reference to revenue to be paid to the State have been upheld. *People* v. *Barger,* 62 Ill. 452; *Illinois Central Railroad Co.* v. *County of McLean,* 17 id. 291.

The conclusions that we have reached on other branches of the case make it unnecessary for us to consider and decide whether, in order to collect the State tax, so called, in said charter, it is necessary to have the property of appellee listed with the Auditor and the tax levied as therein provided or whether such requirements of the charter can be waived. Demurrer No. 3 raised this question.

### *Inter-State Commerce.*

Another question raised relates to inter-State commerce. Said section 22 of appellee's charter provides that it shall pay to the State an amount "equal at least to seven per cent of the gross receipts of said corporation." The State insists that under this provision appellee must pay to it a percentum or share of the gross receipts derived from inter-State traffic carried over the charter lines. Appellee insists that the payment of this per cent on such gross receipts derived from inter-State traffic is an attempt to regulate inter-State commerce, and is therefore in contravention

of that part of section 8 of article 1 of the Federal constitution which provides that Congress "shall have power to regulate commerce with foreign nations and among the several States and with Indian tribes." (Hurd's Stat. 1909, p. 10.)

It may be well to notice at this point the contention of appellee that when this charter was granted there was very little inter-State traffic, and therefore it could not have been intended to include the receipts from inter-State commerce in the amount upon which the seven per cent was to be figured.

The United States government, when it made the grant of land, September 20, 1850, to this State for the building of a railroad, at the same time and by the same act ceded lands to the States of Alabama and Mississippi, stating in the act that it was "in aid of the construction of a railroad from Chicago to Mobile." (9 U. S. Stat. at Large, p. 466.) The charter of appellee stated that the road was to begin at Cairo, and one branch was to end at Chicago and another opposite Dubuque, Iowa. The Ohio and Mississippi rivers were then known as navigable streams and were carrying at that time most of the inter-State traffic in the west. It is clear from that fact as well as from what is stated in these land grants, that it was then understood that the railroad was, in fact, to be inter-State, and was to carry not only inter-State commerce from other railroads but that taken as well from the navigable streams. In discussing this charter in *Illinois Central Railroad Co.* v. *Illinois,* 163 U. S. 142, the court stated (p. 150): "The manifest purpose of Congress was to establish a railroad in the center of the continent, connecting the waters of the Great Lakes with those of the Gulf of Mexico for the benefit of inter-State commerce." In *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Illinois,* 177 U. S. 514, it was stated that the Illinois Central railroad was an inter-State highway established by the authority of Con-

gress. Manifestly, all parties to this charter intended that "the gross or total proceeds, receipts or income derived from said road and branches" should include those derived from the charter lines for transporting inter-State commerce. This is the natural and obvious meaning of the language. The word "gross" is defined by the Standard Dictionary to be "the entire amount; the sum total; without deduction of any kind." That has been the construction put upon this section ever since the charter was granted, for it is conceded that during all these years appellee has paid without objection, semi-annually, to the State seven per cent of what it claimed was the amount of such inter-State traffic receipts from its charter lines.

The State has the inherent power to create and control corporations by legislative action, subject only to Federal and State constitutional limitations. (1 Purdy's Beach on Private Corp. sec. 34.) A corporation is the mere creature of local law, and can have no legal existence beyond the limits of the State where created, except by the authority of the sovereignty in which it wishes to act. As was said in *Augusta* v. *Earle,* 13 Pet. 519: "It must dwell in the place of its creation and cannot migrate to another sovereignty." Having no absolute right of recognition in other States but depending for such recognition and enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those States may think proper to impose. They may exclude the foreign corporation entirely. They may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion. (*Paul* v. *Virginia,* 8 Wall. 168.) The right or privilege to be a corporation and do business is generally deemed of value to the corporators. The State may require, "as a condition of the grant of the franchise

and also of its continued exercise, that the corporation pay a specified sum to the State each year or month, or a specific portion of its gross receipts or of the profits of its business, or a sum to be ascertained in any convenient mode which it may prescribe. The validity of the tax can in no way be dependent upon the mode which the State may deem fit to adopt in fixing the amount for any year which it will exact for the franchise. No constitutional objection lies in the way of a legislative body prescribing any mode or measurement to determine the amount it will charge for the privileges it bestows. It may well seek in this way to increase its revenue to the extent to which it has been cut off by exemption of other property from taxation." (*Home Ins. Co.* v. *New York,* 134 U. S. 594.) It is the settled law, however, that only the Federal government may control inter-State commerce. "Inter-State commerce," as that term is understood with reference to this provision of the Federal constitution, consists of intercourse and traffic between the citizens of the States and includes the transportation of persons and property between points in different States. (Gray on Limitation of the Taxing Power, secs. 827, 830.) It applies to all commerce which crosses the State line, regardless of the distance of the point from which it comes or to which it is bound, before or after crossing such line. It matters not, as applied to a particular carrier, that the whole line is within a State, if the transportation by such carrier is a part of one continuous journey from one State to another under one continuous contract of carriage. (*Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196; *St. Clair County* v. *Inter-State Co.* 192 id. 454; *New York* v. *Knight,* 192 id. 21; *Louisville and Nashville Railroad Co.* v. *Behlmer,* 175 id. 648; *People* v. *Miller,* 178 N. Y. 194.) In *McCulloch* v. *Maryland,* 4 Wheat. 316, Chief Justice Marshall held that as "the power to tax involves the power to destroy," the State governments have no right to tax any of the constitutional

means employed by the government of the Union to execute its constitutional powers, nor to tax or otherwise retard, impede, burden or in any manner control the operations of the constitutional laws enacted by Congress to carry into effect the powers vested in the national government. In *Gibbons* v. *Ogden,* 9 Wheat. 1, the court, in considering the extent of the Federal government's power to regulate commerce, declared that it was complete within itself, and without limitations other than those prescribed by the Federal constitution; that the power was co-extensive with the subject on which it acted, and could not be stopped by the external boundary of a State but must enter its interior as well. The same court held that transportation was essential to commerce, "and every burden laid' upon it is *pro tanto* a restriction. Whatever, therefore, may be the true doctrine respecting the exclusiveness of the power vested in Congress to regulate commerce among the States, we regard it as established that no State can impose a tax upon freight transported from State to State or upon the transporter because of such transportation." '(*P. & R. Railroad Co.* v. *Pennsylvania,* 15 Wall. 232.) Necessarily that power, alone, which governs the whole country can prescribe regulations as to inter-State commerce. "It needs no argument to show that the commerce with foreign nations and between the States, which consists in the transportation of persons and property between them, is a subject of national character and requires uniformity of regulation. Congress alone, therefore, can deal with such transportation. Its non-action is a declaration that it shall remain free from burdens imposed by State 'legislation, otherwise there would be no protection against conflicting regulations of different States, each legislating in favor of its own citizens and products and against those of other States. It was from apprehension of such conflicting and discriminating State legislation, and to secure uniformity of regulation, that the power to regulate commerce with

246—14

foreign nations and among the States was vested in Congress." (*Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196.) A grant by the Federal constitution on this subject must necessarily be as extensive as the mischief, and should comprehend not only commerce among States but all foreign commerce as well. *Brown* v. *Maryland,* 12 Wheat. 419.

Many decisions have been rendered by the United States courts on this question. A few others, only, will be referred to for the purpose of illustrating the application of the rule. It was held in *Smith* v. *Turner,* 7 How. 283, that the imposition of State taxes upon alien passengers arriving in State ports was in contravention of the constitution. In *Almy* v. *California,* 24 How. 169, that a State law imposing a duty upon the import of gold and silver was unconstitutional. In *The Daniel Ball* v. *United States,* 10 Wall. 557, that there was no distinction between the authority of the courts to regulate an agency employed in commerce between the States when that agency extended through two or more States and when it was confined within the limits of a single State. In *Railroad Co.* v. *Husen,* 5 Otto, 465, that a statute was unconstitutional which prohibited the driving or conveying of Texas, Mexican or Indian cattle into Missouri between the first of March and the first of December each year, not being a legitimate exercise of the police power as a quarantine regulation. In *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.* 6 Otto, 1, that the power of Congress to regulate commerce with foreign nations and the several States included the electric telegraph as an agency of inter-State commerce. In *Pickard* v. *Pullman Southern Car Co.* 117 U. S. 34, that a law of Tennessee was void which imposed a privilege tax of $50 per annum on every sleeping car used on every railroad in Tennessee, so far as it applied to the transportation of inter-State passengers. In *Wabash, St. Louis and Pacific Railroad Co.* v. *Illinois,* 118 U. S. 557, that a State stat-

ute which attached a penalty for unjust discrimination as
to the carrying of freight and passengers was void so far
as it applied to inter-State commerce. In *Bowman* v. *Chicago and Northwestern Railroad Co.* 125 U. S. 465, that a
statute forbidding common carriers bringing intoxicating
liquors into Iowa without first obtaining a certificate from
that State was a regulation of commerce and unconstitutional. In *Crutcher* v. *Kentucky,* 141 U. S. 47, that a law
which provided that the agent of an express company not
incorporated by the State could not carry on business there
without first obtaining a license was unconstitutional so
far as it applied to inter-State commerce. In *Cleveland,
Cincinnati, Chicago and St. Louis Railway Co.* v. *Illinois,*
177 U. S. 514, that a law of the State which required all
passenger trains to stop at county seats was an unlawful interference with inter-State commerce. In *Hanley* v. *Kansas
City Southern Railway Co.* 187 U. S. 617, that the attempt
of a railway commission of Arkansas to fix the rates for
goods between two points within that State when a large
part of the route was outside of the State, through Indian
Territory or Texas, was a regulation of inter-State commerce.

Not everything which affects inter-State commerce
amounts to its regulation within the meaning of the constitution. The courts have often found it difficult to draw
the line between the State and Federal power. Nice distinctions have been made in attempting to distinguish as
to Federal and State affairs, and the line of distinction is
apparently often indistinct and shadowy. (Cooley's Const.
Lim.—4th ed.—732; *Gloucester Ferry Co.* v. *Pennsylvania,*
114 U. S. 196.) As was said by the late Justice Miller in
*Fargo* v. *Michigan,* 121 U. S. 230, on page 240: "As to
what enactments by the State legislatures are in violation
of the constitutional provision, [on inter-State commerce,]
it may be admitted that the court has not always employed

the same language, and all the judges of the court who have written opinions may not have meant precisely the same thing" in what they have written.

A tax may be imposed upon the property within the State of a foreign or domestic corporation whatever business it may be engaged in, and may take the form of a tax for the privilege of exercising its franchise in the State, if the amount of the tax is dependent upon and fixed by the value of the property situated in the State. "The corporation is thus made to bear its proper proportion of the burdens of the government under whose protection it conducts its operations, while inter-State commerce is not, in itself, subjected to restraint or impediment. * * * The right of a State to tax the franchise or privilege of being a corporation, as personal property, has been repeatedly recognized by this court, and this whether the corporation be a domestic or a foreign corporation doing business by its permission within the State. But a State cannot exclude from its limits a corporation engaged in inter-State or foreign commerce or a corporation in the employment of the general government, either directly in terms or indirectly by the imposition of inadmissible conditions. Nevertheless, the State may subject it to such property taxation as only incidentally affects its occupation, as all business, whether of individuals or corporations, is affected by common governmental burdens." *Postal Telegraph-Cable Co.* v. *Adams,* 155 U. S. 688.

The decisions cited and relied on by the appellee on this point are, without exception, cases in which the State has attempted to levy a tax on inter-State commerce after the charter of the corporation was granted. No case has been cited, and we have found none, declaring a charter contract similar to the one here in question invalid as a regulation of inter-State commerce. Perhaps the case most nearly like this is that of *Baltimore and Ohio Railroad Co.* v. *Maryland,* 21 Wall. 456. That was an action by the State

of Maryland against the railroad company to recover a certain sum under a provision of said company's charter that it should pay to the State every six months one-fifth of the whole amount received during that period for the transportation of passengers on said road.   The charter was accepted and payment made for many years, but the company finally disputed the constitutionality of that provision of its charter and refused further payment.   In discussing the right of the State to collect said payment the court said (p. 471) : "This unlimited right of the State to charge, or to authorize others to charge, toll, freight or fare for transportation on its roads, canals and railroads arises from the simple fact that they are its own works or constructed under its authority.   It gives them being.   It has a right to exact compensation for their use.   It has a discretion as to the amount of that compensation.   That discretion is a legislative—a sovereign—discretion, and in its very nature is unrestricted and uncontrolled.   *   *   *   This exercise of power on the part of a State is very different from the imposition of a tax or duty upon the movements or operations of commerce between the States.   Such an imposition, whether relating to persons or goods, we have decided the States cannot make, because it would be a regulation of commerce between the States in a matter in which uniformity is essential to the rights of all and therefore requiring the exclusive regulation of Congress.   *   *   *   While it is commonly said that the State has absolute control over the corporations of its own creation and may impose upon them such conditions as it pleases, and like control over its own territory, highways and bridges, and may impose such exactions for their use as it sees fit, on the other hand it is conceded that it cannot regulate or impede inter-State commerce nor discriminate between its own citizens and those of other States, prejudicially to the latter.   The problem is to reconcile the two propositions, and as the latter arises from the provisions of the constitution of the United States,

and is therefore paramount, the question is practically reduced to this: what amounts to a regulation of commerce between the States or to a discrimination against the citizens of other States? This is often difficult to determine. In view, however, of the very plenary powers which a State has always been conceded to have over its own territory, its highways, its franchises and its corporations, we cannot regard the stipulation in question as amounting to either of these unconstitutional acts. * * * It may incidentally affect transportation, it is true; but so does every burden or tax imposed on corporations or persons engaged in that business. Such burdens, however, are imposed *diverso intuitu* and in the exercise of an undoubted power. The State is conceded to possess the power to tax its corporations, and yet every tax imposed on a carrier corporation affects, more or less, the charges it is compelled to make upon its customers. So the State has an undoubted power to exact a bonus for the grant of a franchise, payable in advance or *in futuro;* and yet that bonus will necessarily affect the charge upon the public which the donee of the franchise will be obliged to impose."

It is argued by counsel for appellee that this decision has been practically overruled by later decisions of that court. While it is true that the court overruled its statement in the case just referred to,—that the rates of transportation were entirely discretionary with the State authorities,—in *Wabash, St. Louis and Pacific Railroad Co.* v. *Illinois,* 118 U. S. 557, it has never attempted to distinguish or overrule its holding that the State has the undoubted power to exact a bonus for the grant of a franchise, payable in advance or *in futuro.* On the contrary, it has repeatedly referred to this doctrine with approval. (*Stone* v. *Farmer's Loan and Trust Co.* 116 U. S. 307; *Pickard* v. *Pullman Southern Car Co.* 117 id. 34; *Ashley* v. *Ryan,* 153 id. 436; *Horn Silver Mining Co.* v. *New York,* 143 id. 305; *Covington and Cincinnati Bridge Co.* v. *Kentucky,*

154 id. 204; *Northern Securities Co.* v. *United States,* 193 id. 197.) The authorities have always held that there is an essential distinction between a tax and a bonus. (*Commonwealth* v. *Erie and Western Transportation Co.* 107 Pa. 112; 2 Beach on Railways, sec. 1017; 1 Bouvier's Law Dict.—Rawle's ed.—p. 254.) In *Ashley* v. *Ryan,* 153 U. S. 436, an application was made to the State of Ohio to allow a consolidation of certain railroads. The State would only permit such consolidation on condition that it be paid a fee of one-tenth of one per cent of the value of the entire stock of the consolidated company. The court in that case stated (p. 446) that "the payment of the charge was a condition imposed by the State of Ohio upon the taking of corporate being or the exercise of corporate franchises, the right to which depended solely on the will of that State, and hence the liability for the charge was entirely optional." The court concluded that the exaction "constituted no tax upon inter-State commerce or the right to carry on the same or the instruments thereof, and that its enforcement involved no attempt on the part of the State to extend its taxing power beyond its territorial limits."

In *Philadelphia and Reading Railroad Co.* v. *Pennsylvania,* 15 Wall. 284, the State of Pennsylvania levied a tax upon the gross receipts of the railroad company, and it was held that such a tax was not a tax upon inter-State transportation or in conflict with the Federal constitution. It is contended by counsel for appellee that this case has been overruled in *Fargo* v. *Michigan,* 121 U. S. 230, and *Philadelphia Steamship Co.* v. *Pennsylvania,* 122 id. 326. In neither of these last mentioned cases did the court state in precise terms that the case in question was overruled, but, on the contrary, it attempted in both cases to distinguish the former case. No one, however, can examine the opinions in those cases and the later opinions of that court upon inter-State commerce without being impressed with the obvious tendency of that court to enlarge the Federal power

and limit the power of the State as to collecting revenue in any form from commerce and its instruments. But conceding that *Philadelphia and Reading Railroad Co.* v. *Pennsylvania, supra,* had been practically overruled by the later decisions, such fact would be far from conclusive in deciding the present case, as that case concerned a tax in the strict sense of the term, levied after the charter had been granted, and involved in no way the question of a voluntary contract entered into by the railroad company at the time its charter was granted. Furthermore, the later decisions of that court wherein the facts were more nearly like those in the present case tend to uphold the contention of the State as to the proper construction of the appellee's charter. In *Maine* v. *Grand Trunk Railway Co.* 142 U. S. 217, the court held that a State statute which required a railroad corporation to pay an annual tax for the privilege of exercising its franchise, on the amount of its gross transportation receipts, and provided that a railroad lying partly within and partly without the State should pay a tax computed in a specified way on the gross receipts in the State, did not conflict with the Federal constitution. In *Adams Express Co.* v. *State Auditor,* 165 U. S. 194, the court laid down practically the same rule, and held that such a requirement by the State was not an attempt to tax property having a situs outside of the State, but only to place a just value on that within. To the same effect are *Wisconsin and Michigan Railway Co.* v. *Powers,* 191 U. S. 379, and *McHenry* v. *Alford,* 168 id. 651.

Appellee insists that the late decision in *Galveston, Harrisburg and San Antonio Railroad Co.* v. *Texas,* 210 U. S. 217, is decisive of this question in its favor. In that case the State of Texas had imposed a tax upon railway companies whose lines were wholly within the State, equal to one per cent of their gross receipts, where in some cases much the larger part was derived from inter-State commerce. The court there said (p. 218) : "It being once ad-

mitted, as, of course, it must be, that not every law that affects commerce among the States is a regulation of it in a constitutional sense, nice distinctions are to be expected. Regulation and commerce among the States both are practical rather than technical conceptions, and, naturally, their limits must be fixed by practical lines. * * * The State must be allowed to tax the property, and to tax it at its actual value as a going concern. On the other hand, the State cannot tax the inter-State business. The two necessities hardly admit of an absolute logical reconciliation. Yet the distinction is not without sense. When a legislature is trying simply to value property, it is less likely to attempt or to effect injurious regulation than when it is aiming directly at the receipts from inter-State commerce. A practical line can be drawn by taking the whole scheme of taxation into account. That must be done by this court as best it can. Neither the State courts nor the legislatures, by giving the tax a particular name or by the use of some form of words, can take away our duty to consider its nature and effect. If it bears upon commerce among the States so directly as to amount to a regulation in a relatively immediate way, it will not be saved by name or form." In that case the court quoted with approval from *Postal Telegraph-Cable Co.* v. *Adams,* 155 U. S. 688, the following: "By whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property, or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the constitution." The court held that the Texas law was unconstitutional, as directly affecting and regulating inter-State commerce. The fact that four of the members of that court dissented shows that the case was a close one, and that the line of distinction between the power of the State and Federal governments was, indeed, dim and shadowy.

Under the reasoning of the majority opinion in the last case the provision of the charter here in question

would not be unconstitutional, for it amounts to no more than a requirement that a just equivalent for an ordinary tax shall be paid the State, and this court has so held. In *Illinois Central Railroad Co.* v. *County of McLean,* 17 Ill. 291, on page 292, the court said that "the payments provided for in the eighteenth section of their charter have been constitutionally substituted under the second section of the constitution in lieu of the general rule of uniformity and proportion fixed in its first clause." In *People* v. *Barger,* 62 Ill. 452, this court, in referring to the decision just quoted from, said (p. 456) : "That case holds that it is within the constitutional power of the legislature to exempt property from taxation or to commute the general rate for a fixed sum, and that the provision in the charter of the Illinois Central Railroad Company exempting its property from taxation upon the payment of a certain portion of its earnings was constitutional. The case proceeds on the principle that the proportion of the earnings of the company to be paid to the State is equal to the burden of the State tax imposed on the citizens and other corporations in the State, which is thought to answer the requirements of the constitution that 'every person or corporation shall pay a tax in proportion to his or her property.' The case can be supported on no other principle."

Clearly, the provisions of appellee's charter as to revenue were inserted as a fair method of fixing an equivalent for a tax that would otherwise ordinarily be levied on the property of appellee, and were in no sense an attempt to regulate or impose a tax upon inter-State commerce. Such payment of seven per cent on the gross receipts was used as a substitute measure for ordinary taxes. Under the reasoning in *Galveston, Harrisburg and San Antonio Railway Co.* v. *Texas,* 210 U. S. 217, a payment, under such circumstances, of seven per cent of the gross proceeds on inter-State traffic would be upheld. The provisions of appellee's

charter for the payment of the percentage in question are based upon an entirely different principle from the levying of taxes on a corporation after its franchise has been granted. The payment differs in principle from an ordinary tax. It was a contract voluntarily entered into by appellee. We agree fully with the reasoning of the United States Supreme Court in *Western Union Telegraph Co.* v. *Kansas,* 30 Sup. Ct. Rep. 190, where it was said: "It is of last importance that the freedom of inter-State commerce shall not be trammeled or burdened by local regulations, which, under the guise of regulating local affairs, really burden rights secured by the constitution and laws of the United States." The provisions of this charter in no way conflict with that doctrine. Their enforcement will not, in our judgment, unduly interfere with inter-State commerce or such free intercourse between all parts of the country as is demanded by the letter and spirit of the Federal constitution. The demurrers or parts of demurrers which seek to raise only this question cannot be sustained.

## *Accounting.*

The third question raised is, that the facts averred in the bill show that the semi-annual statements were settled accounts, and that no facts are set out in the bill showing that in equity these accounts should be re-opened and re-examined. The Attorney General insists that no copy of the accounts, as that term should be understood under the charter, was ever furnished by appellee during any of these years to the Governor of the State, and he further insists that the Governor has no power to fix and approve the proper amount to be paid semi-annually. Copies of these semi-annual statements for the years in question were attached to the bill as exhibits. The first copy of said semi-annual statements reads as follows:

"ILLINOIS CENTRAL RAILROAD COMPANY.

*Statement of gross earnings in Illinois for the six months end-
ing 30th April, 1878.*

|       | Freight.      | Passenger.   | Mail.      | Express.     | Miscel.      | Total.         |
|-------|---------------|--------------|------------|--------------|--------------|----------------|
| Nov.  | $274,978 75   | $82,821 15   | $8,295 14  | $7,839 00    | $22,995 71   | $396,929 75    |
| Dec.  | 233,714 42    | 93,867 90    | 8,295 14   | 7,839 00     | 23,609 26    | 367,325 72     |
| Jan.  | 276,347 34    | 78,768 14    | 8,295 14   | 10,935 00    | 22,188 71    | 396,534 33     |
| Feb.  | 199,896 36    | 71,853 61    | 8,295 34   | 5,640 00     | 25,639 99    | 311,325 30     |
| Mar.  | 218,896 89    | 81,677 66    | 8,295 23   | 8,450 00     | 24,483 10    | 341,802 88     |
| Apr.  | 225,658 76    | 82,333 98    | 8,295 24   | 8,644 80     | 21,571 23    | 346,504 01     |
|       | $1,429,492 52 | $491,322 44  | $49,771 23 | $49,347 80   | $140,488 00  | $2,160,421 99  |

*Recapitulation.*

Freight......... ..................... ............................$1,429,492 52
Passengers....... ..................... ........................... 491,322 44
Mail................. ..................... ..................... 49,771 23
Express......... ..................... ..................... 49,347 80
Miscellaneous.... ..................... ..................... 140,488 00

Total......... ..................... ..................$2,160,421 99
Seven per cent upon which is..............................$151,229 54

"STATE OF ILLINOIS,  ⎱
Cook County, Chicago. ⎰ ss.

"John C. Welling, being duly sworn, states upon oath that he
is the auditor of the Illinois Central Railroad Company in Illinois,
and that said company has no secretary in said State; and that
this affiant further states the foregoing statement of gross earn-
ings derived from said road for the six months ending 30th April,
1878, is a correct abstract and statement from the books and ac-
counts of said company.                               J. C. WELLING.

"Subscribed and sworn to before me this 5th day of June, 1878.
(Seal.)                            BERNT MOE, *Notary Public.*"

Endorsed on the back as follows:

"Illinois Central R. R. Co.—Statement of gross earnings for
six months ending April 30th, 1878, $151,229.54.—Examined and
approved June 8, 1878.—S. M. Cullom, *Governor.* No. 45, filed in
Auditor's office June 8, 1878.—T. B. Needles, *Auditor P. A.*"

The form of affidavit attached to this first report has
been substantially followed in all the other reports, except-
ing that since 1890 "gross earnings" has been changed to
"gross receipts." All of the affidavits except two of the
later ones have been sworn to by John C. Welling, in the
successive capacities of auditor in Illinois, auditor, general
auditor, comptroller, and vice-president. One of the two
not signed by him was sworn to by the comptroller and the
other by the assistant to the president.

A typical report from near the middle of the period here involved is as follows:

## ILLINOIS CENTRAL RAILROAD.

### Statement of gross receipts for the six months ended April 30th, 1890.

| Receipts. | 1889. | | 1890. | | | | Total. |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | November. | December. | January. | February. | March. | April. | |
| Freight | $390,018 48 | $371,339 76 | $351,245 15 | $334,742 54 | $366,241 87 | $377,425 89 | $2,191,013 69 |
| Passenger | 119,768 33 | 128,239 36 | 119,565 24 | 117,953 21 | 119,964 21 | 115,181 86 | 720,672 21 |
| Mail | 11,624 48 | 11,658 64 | 11,056 14 | 11,740 87 | 11,740 88 | 10,775 36 | 68,596 37 |
| Express | 10,956 83 | 12,491 42 | 11,409 67 | 10,302 86 | 10,953 80 | 13,197 58 | 68,812 16 |
| Excess baggage | 1,438 55 | 1,077 44 | 2,329 07 | 1,630 66 | 1,429 97 | 1,623 66 | 9,529 35 |
| Transportation of milk | 1,175 05 | 1,233 35 | 1,239 30 | 1,155 55 | 1,242 60 | 1,235 50 | 7,281 45 |
| Sleeping cars | 1,620 99 | 1,257 83 | 1,247 43 | 1,188 00 | 1,162 37 | 1,394 04 | 7,870 66 |
| Rent of property | 8,718 85 | 8,629 76 | 8,877 36 | 8,697 22 | 8,745 34 | 8,744 12 | 52,412 65 |
| Rent of docks | 1,668 34 | 1,668 38 | 1,668 40 | 1,668 34 | 1,688 39 | 1,668 12 | 10,030 24 |
| Rent of tracks | 19,966 89 | 20,089 62 | 17,446 35 | 17,660 41 | 15,767 52 | 17,586 74 | 108,517 53 |
| Cairo wharf boat | 206 95 | 214 13 | 270 17 | 375 01 | 118 11 | 112 61 | 1,296 98 |
| Storage | | 22 00 | | | | | 22 00 |
| Dockage | 159 12 | 183 35 | 355 00 | 1 85 | | 100 00 | 799 32 |
| Switching | 3,840 63 | 3,388 52 | 3,732 15 | 2,687 18 | 3,365 75 | 2,824 06 | 19,838 29 |
| Train privileges | 568 00 | 568 00 | 568 00 | 618 50 | 618 50 | 618 00 | 3,559 50 |
| Demurrage | 438 00 | 202 00 | 441 00 | 369 00 | 292 00 | 317 00 | 2,059 00 |
| Total | $572,169 49 | $562,063 66 | $531,450 43 | $510,791 20 | $543,031 31 | $552,805 31 | $3,272,311 40 |

$3,272,311.40 at 7 per cent is $229,061.80.

STATE OF ILLINOIS, } ss.
Cook County, Chicago. }

John C. Welling, being duly sworn, states upon oath that he is the comptroller of the Illinois Central Railroad Company, and that said company has no secretary in this State; and said affiant further states that the foregoing statement of gross receipts derived from said road for the six months ended 30th April, 1890, is a correct abstract and statement from the books and accounts of said company,

J. C. WELLING.

Subscribed and sworn to before me, this 6th day of June, 1890.

[SEAL]

JOHN DUNN, Notary Public.

Endorsed on the back as follows:

Ill. Central R. R. Co.—Statement of gross receipts for the six months ending April 30, 1890.—The within statement has been examined and is respectfully referred to the Auditor of Public Accounts for filing.—J. W. Fifer, Governor,—June 19th, 1890. No. 69, filed in Auditor's office, Jun. 19th, 1890.—C. W. Pavey, Auditor P. A.

A typical report in the latter part of the period in question is as follows:

## ILLINOIS CENTRAL RAILROAD.—705.5 MILES.

Statement of gross receipts for the six months ended October 31, 1906.

| | May. | June. | July. | August. | September. | October. | Total. |
|---|---|---|---|---|---|---|---|
| Freight | $892,998 65 | $938,173 04 | $934,984 04 | $1,043,134 72 | $1,016,193 13 | $1,061,691 43 | $5,877,175 01 |
| Passenger | 290,140 06 | 313,997 47 | 328,234 10 | 366,433 24 | 340,777 05 | 343,888 71 | 1,982,620 63 |
| Mail | 23,185 12 | 23,081 48 | 23,185 12 | 23,185 00 | 23,100 12 | 23,185 12 | 138,922 05 |
| Express | 16,000 00 | 16,000 00 | *16,650 00 | *16,650 00 | *16,650 00 | *16,650 00 | 98,600 00 |
| Excess baggage | 3,852 53 | 3,487 06 | 2,969 60 | 2,741 02 | 3,788 32 | 5,069 80 | 21,908 33 |
| Transportation of milk | 2,051 75 | 2,234 07 | 2,321 07 | 2,280 57 | 2,118 83 | 1,972 65 | 12,979 14 |
| Parlor cars | 236 94 | 235 24 | 238 69 | 298 54 | 282 32 | 264 82 | 1,556 55 |
| Train privileges | 1,275 73 | 2,855 94 | 1,283 14 | 1,271 64 | 1,271 64 | 1,271 64 | 9,229 73 |
| Rent of property | 24,811 33 | 25,096 33 | 24,521 12 | 24,407 36 | 24,139 32 | 23,894 23 | 146,869 69 |
| Rent of tracks | 26,999 01 | 17,438 14 | 18,355 23 | 18,663 73 | 19,578 11 | 20,343 23 | 121,377 45 |
| Cairo wharf boat | 13 49 | 59 01 | 32 01 | 46 06 | 51 97 | 33 94 | 246 48 |
| Switching | 9,203 84 | 8,700 38 | 8,875 26 | 9,768 18 | 8,442 22 | 9,515 34 | 54,505 22 |
| Demurrage | 10,495 95 | 1,921 44 | 3,690 90 | 1,910 00 | 3,570 00 | 4,433 00 | 26,021 29 |
| Team scale fees | 77 70 | 217 40 | 139 00 | 96 10 | 168 50 | 312 70 | 1,011 40 |
| Storage | 646 00 | 658 63 | 703 96 | 750 20 | 922 30 | 933 90 | 4,624 99 |
| Proportion of freight tolls over Dubuque Bridge in excess of $150,000 per annum | 9,254 61 | 14,533 80 | 12,938 39 | 10,354 37 | 12,671 45 | 15,493 02 | 75,245 64 |
| Total | $1,311,242 71 | $1,367,789 40 | $1,379,171 63 | $1,522,000 85 | $1,473,735 28 | $1,518,953 73 | $8,572,893 60 |

$8,572,893.60 at 7 per cent=$600,102.55.

*Based on estimate furnished by express company, who are now engaged in determining actual receipts adjustment to basis of actual figures will be made in next statement.

STATE OF ILLINOIS, } ss.
Cook County, Chicago. }

J. F. Titus, being duly sworn, states upon oath, that he is the assistant to the president of the Illinois Central Railroad Company and that said company has no secretary in this State; and said affiant further states that the foregoing statement of gross receipts derived from said road for the six months ended October 31st, 1906, is a correct abstract and statement from the books and accounts of said company.

J. F. TITUS.

Subscribed and sworn to before me this 1st day of December, 1906.

[SEAL]      CHAS. F. STEINMETZ. *Notary Public.*

The exhibits show that these semi-annual reports, from that ending April 30, 1878, to that ending October 31, 1881, were signed by Gov. Cullom as "examined and approved." The two following, in the year 1882, were signed by him as "approved." The four signed by Gov. Hamilton during 1883 and 1884 were marked by him as "approved." The first statement to Gov. Oglesby (for the six months ending April 30, 1885,) was marked as "received and examined," and the following ones, down to and including the six months ending April 30, 1888, (with the exception of two filed in 1886, which are not signed in any manner by the Governor,) were signed by him as "examined and referred to the Auditor of Public Accounts for filing." The last report filed during Gov. Oglesby's term (for the half year ending October 31, 1888,) does not seem to have been examined or acted upon by him, but on March 4, 1889, it was signed by Lyman B. Ray, acting Governor, with this notation: "The within statement has been examined and is respectfully referred to the Auditor of Public Accounts." Gov. Fifer signed all the reports submitted during his term in 1889, 1890, 1891 and 1892, with a notation substantially the same as that just referred to by acting Governor Ray. Gov. Altgeld signed the first two reports submitted during his term as "examined and referred to Auditor." Since that time, and down to and including 1906,—that is, during the remainder of Gov. Altgeld's term, and during Gov. Tanner's, Gov. Yates' and the first two years of Gov. Deneen's terms,—there has been no signature or notation on the reports by the Governor or in his office, with the exception of the one for the half year ending October 31, 1895, which was marked "approved" by Gov. Altgeld, and the one for the six months ending October 31, 1903, during Gov. Yates' administration, which is simply marked "received executive office," without any signature. Most of these statements are marked with the filing marks of the

Auditor's office, while a few have no marks on them to indicate that they were ever filed in that office.

That part of section 18 of appellee's charter which refers to the keeping of accounts and furnishing a copy to the Governor reads: "For the purpose of ascertaining the proceeds, receipts or income aforesaid, an accurate account shall be kept by said company, a copy whereof shall be furnished to the Governor of the State of Illinois." In their brief, counsel for the State argue that this means that the company must necessarily include all the items that go to make up its total or gross receipts, but the Attorney General in the oral argument finally summed up his contention on this point by stating that the copy of the accounts need not be a copy of all the books, schedules and data which enter into and make up the account; that such an account would be wholly impractical and useless; that the purpose of furnishing a copy of an account was to furnish the Governor with such knowledge of the company's affairs and insight into its methods that he could make a speedy investigation into the correctness of the report; that the copy should "not only show classified totals and ledger balances, but how the earnings which produced these totals were made up, the methods employed in dividing joint receipts, distributing joint expenses, deducting bridge arbitraries, using charter line terminals, and in a general way all the methods employed which directly affected the basis of the account." It is conceded by all parties to this litigation that the books of account and the vouchers referred to were so numerous and voluminous that those pertaining "to a single period of six months since the year 1877 would occupy almost the entire space of an ordinary freight car in use at the present time." To furnish an itemized account containing all items of receipts under such circumstances would be not only impractical, but would defeat the very purpose for which the accounts were required. It might consume almost as much time to

investigate and pass upon such an account as to prepare it in the first place.   Under this provision of the charter the Governor could require a reasonable statement of account, showing, generally, from what sources the receipts were obtained, in order to furnish him with such knowledge of the company's affairs that he might be able to pass understandingly on the correctness of the account.   This does not appear to have been required by any of the Governors. Must it be held that the accounts or statements that were returned to the Governors do not comply with the requirements of the charter?   The word "account" has no clearly defined legal meaning or definition.   In its primary meaning an account is some matter of debt or credit, or of a demand in the nature of a debt or credit between the parties, arising out of a contract or fiduciary relation or from some duty imposed by law, and is not required to be in any particular form or necessarily to contain detailed information.   The word is flexible in its meaning, depending somewhat on surrounding circumstances and the connection in which it is used.   (*Preston Nat. Bank* v. *Purifier Co.* 102 Mich. 462; *Nelson* v. *Posey County,* 105 Ind. 287; *Millet* v. *Bradbury,* 109 Cal. 170; Bouvier's Law Dict.; 1 Ency. of L. & P. p. 680, and cases cited.)   An account may be no more than a list or catalogue of items, whether of debts or credits.   (*Rensselaer Glass Factory* v. *Reid,* 5 Cow. 587.)   Parties who have the authority to pass upon and settle an account may waive their right to have the account fully itemized.   *Ogden* v. *Astor,* 4 Sandf. 311; *Farnam* v. *Brooks,* 26 Mass. 212.

What power or authority rested in the Governor as to settling and fixing the amount of these semi-annual statements?   The general rule is, that the State, like a municipal corporation, is bound by the acts of its officers when they are acting within the scope of their authority, but when this authority is solely conferred by statute, all persons must at their peril see that the act of the official is within

the power under which he is acting. (1 Dillon on Mun. Corp.—3d ed.—sec. 531; Mechem on Public Officers and Agents, sec. 842; *Slaughter* v. *State,* 132 Ind. 465; *People* v. *Stephens,* 71 N. Y. 527; *Allen* v. *Blunt,* 3 Story, 742; *Linville* v. *State,* 130 Ind. 210.) A stricter rule prevails with reference to the acts and declarations of public agents than ordinarily governs mere private agents. Mechem on Public Officers and Agents, sec. 841; Story on Agency, (9th ed.) sec. 307*a.*

The Governor derives his authority to act with reference to these accounts solely from that part of section 18 of said charter which reads: "For the purpose of verifying and ascertaining the accuracy of such account, full power is hereby vested in the Governor of the State of Illinois, or any other person by law appointed, to examine the books and papers of said corporation, and to examine, under oath, the officers, agents and employees of said company, and other persons; and if any person so examined by the Governor or other authority shall knowingly and willfully swear falsely, or if the officers making such affidavits shall knowingly and willfully swear falsely, every such person shall be subject to the pains and penalties of perjury." It is contended, on the one hand, that this provision of the charter gives the Governor only the power to investigate and find out whether the account is correct, and not in any manner to adjust or settle it. On the other hand, it is just as earnestly contended that this provision must necessarily give the Governor authority not only to investigate but to fix and settle,—that is, full power to audit and approve the accounts.

Powers other than those expressly granted by charter or statute are often conferred by implication. It is the usual rule that when the constitution gives a general power or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one or the performance of the other. (*Field* v. *People,* 2 Scam. 79.)

That the Governor could have been granted authority to audit and settle these accounts with appellee is not questioned by the State. It is, however, insisted that the charter does not grant such power. The charter clearly grants him more than merely ministerial power to receive and file the account. He is, in terms, granted full power to "ascertain" and "verify" its accuracy. Webster defines "ascertain" as "to make certain to the mind; to free from obscurity, doubt or chance; to make sure of; fix; to determine." The same author defines "verify" as "to prove to be correct; to establish the truth of; confirm; to substantiate." The Century dictionary defines the word "ascertain" as "to make certain; determine; establish; to establish with certainty; to fix;" and the word "verify" as "to ascertain to be correct; to be corrected if found erroneous, as to verify a statement, quotation, reference, account or reckoning of any kind; to verify the items of a bill or the total amount; to prove to be true; confirm; establish the truth of." Substantially the same definitions are given by the Standard and other dictionaries. These definitions tend strongly to show that the Governor was not only authorized to fix and determine whether the account was correct, but to correct it if found erroneous. The Governor has duties placed upon him by law in which he has no discretion but performs a simple ministerial duty. He also has many duties in which he has full power and discretion to act finally. In *Sutherland* v. *Governor*, 29 Mich. 320, in discussing the power of the Governor, Judge Cooley said (p. 323): "It is not customary in our republican government to confer upon the Governor duties merely ministerial and in the performance of which he is to be left no discretion whatever, and the presumption in all cases must be, where a duty is devolved upon the chief executive of the State rather than upon an inferior officer, that it is so because his superior judgment, discretion and sense of responsibility were confided in for a more accu-

rate, faithful and discreet performance than could be relied upon if the duty were devolved upon an officer chosen for inferior duties." The Governor, by section 5 of appellee's charter, was made a director *ex-officio* perpetually, with authority to vote either in person or by proxy. The fact that he held this official position would indicate that he had power, because of that position, to look into the business affairs of appellee. Sound public policy and good business sense, it seems to us, would require that there should be some official, other than the judges of the courts, having authority and power to examine and settle as to these various semi-annual accounts.

It is argued by the State that the men who granted this charter were able and far-seeing, and had they desired to give the Governor the power to settle and approve these accounts they would have so provided in specific terms. We think it is clear that the legislature intended that the Governor could not only investigate the accounts, but finally adjust and settle them. If this authority is not clearly given in express words in the charter, in our judgment it is necessarily implied.

It is suggested that granting to the Governor power to settle and adjust these accounts is contrary to the spirit of the constitution, which provides that the powers of the government shall be divided into three departments; that the power to pass upon and settle these accounts is judicial,—one which under our constitution should only be placed in the courts. The fundamental principle underlying this division of powers is to be understood in a limited and qualified sense. The legislative, executive and judicial powers are not to be kept so entirely separate and distinct as to have no connection or interdependence. In every constitution there is a blending and admixture of different powers. "This admixture, in practice, so far as to give each department a constitutional control over the others, is considered by the wisest statesmen as essential in a free

government as a separation." (*Field* v. *People,* 2 Scam. 79; *Sherman* v. *.People,* 210 Ill. 552.) In Cooley on Torts that author says (p. 375): "Official duties are supposed to be susceptible of classification under the three heads of legislative, executive and judicial, corresponding to the three departments of government bearing the same designations; but the classification cannot be very exact, and there are many officers whose duties cannot properly, or at least, exclusively, be arranged under either of these heads." Certain administrative officers are frequently charged with duties that partake of the character of all three of the departments but which cannot be classed as belonging especially to either. Administrative and executive officers are frequently called upon, in the performance of their duties, to exercise judgment and discretion, to investigate, deliberate and decide, and yet it has been held that they do not exercise judicial power, within the meaning of the constitutional provision. (*Owners of Lands* v. *People,* 113 Ill. 296; *People* v. *Bartels,* 138 id. 322; *People* v. *Simon,* 176 id. 165.) The power exercised is ministerial or executive, but as an incident to it the official is called upon to perform acts which are in their nature judicial,—very nearly akin to those exercised by the courts. Such powers, when conferred upon other officials than judges, are often termed *quasi* judicial or discretionary. They are said to "lie midway between the judicial and ministerial ones. The lines separating them from such as are thus on their two sides are necessarily indistinct, but in general terms, when the law, in words or by implication, commits to any officer the duty of looking into facts and acting upon them, not in a way which it specifically directs but after a discretion in its nature judicial, the function is termed *quasi* judicial." Bishop on Non-Contract Law, secs. 785, 786; Mechem on Public Officers and Agents, sec. 637.

It is argued that if the Governor possesses the power to settle or state this account he is given power to change

the charter contract, which is expressly prohibited by that clause of the constitution of 1870 which provides that no contract, obligation or liability of the appellee company for the payment of money to the State shall be modified, altered or changed in any way by legislative or other authority. If the charter provided that the percentage should be paid by the appellee upon a fixed capital or amount, neither the Governor nor any other authority could change that amount. No legislative or other authority for the State can change the rate percentum to be paid to the State from seven to nine, or any other per cent, without a change of the constitution. That, however, is not the question here. It is apparent from this record that there can be an honest difference of opinion as to the methods that should be followed in making up the gross proceeds upon which the appellee is to base its reckoning for paying the seven per cent to the State. For example, it is contended by the State that the division between the charter and non-charter lines would ordinarily be made upon a mileage basis, while counsel for appellee insist that such division should always be made upon an equitable basis. The State concedes that in certain cases the mileage basis could not be used in making a just division of such receipts. It therefore necessarily follows that there can be an honest difference of opinion as to what should be the proper basis for a division of the proceeds in a given instance. As a practical question, there must be some authority that can act for the State and decide. To so construe the constitution does not change or modify the charter contract. It is simply giving such a construction to the provisions of appellee's charter that it can be practically carried out and enforced.

Counsel for the State ask, if this power rests with the Governor, what redress would the State have if he, intentionally or unintentionally, made a mistake in examining and settling the accounts? The State, under those circumstances, would have the same redress as it has in all cases

where an officer is charged with discretionary duties. The courts can only review his decision for fraud, accident or mistake. But counsel for the State insist that the framers of this charter never intended to lodge such power in a single individual, whoever he might be. It is well known that the duties of adjusting and settling accounts are ordinarily, under our system of government, placed upon executive and administrative officers rather than upon the courts; that such executive and administrative officers have very similar power in settling and adjusting accounts to that which individuals have in similar matters. Even though the statute confers upon a public official general discretionary power, his authority is not to be deemed an unlimited one. The exercise of such discretion must be within the evident purpose of the statute. (Mechem on Public Officers and Agents, sec. 513.) Are not executive officers as liable as the courts to reach correct results in complicated business affairs, where speedy action is required? Indeed, it would be very difficult, if not impossible, from a practical standpoint, for the courts, if charged with the responsibility every six months of adjusting this account, to satisfactorily perform such duties. One person, if honest and capable, is far better able, from a business and practical standpoint, to adjust such matters than a number of individuals would be. Moreover, the courts are organized along such lines that they are not adapted to perform executive or business duties such as required in the settlement of these accounts semi-annually. Most matters connected with the raising of revenue, where discretion is allowed, are committed to departments of government other than the judiciary, and their decisions in such matters will only be set aside by the courts for fraud, accident or mistake.

We are disposed to hold that the Governor has the power, under this charter, to adjust, audit and approve the semi-annual accounts. This power, as we have seen, is not strictly judicial. His finding as to such accounts is not an

adjudication, but simply an adjustment or striking a balance. As was said of the finding of other public authorities concerning other accounts: "Doubtless it would be, like any other settlement of accounts by individuals, *prima facie* evidence of the balance struck, * * * and may be opened by showing fraud or mistake or that any item really existing was not taken into account." (*Kinney* v. *People,* 3 Scam. 357.) He "could enter up no judgment against the defendant for the balance found due, nor have * * * any means of enforcing payment of such balance except by a resort to the ordinary courts of law." (*Washington County* v. *Parlier,* 5 Gilm. 232.) Within the limits of his power to act his decision controls. Men are so fallible and human discernment so imperfect that the power to hear and determine necessarily carries with it the power which makes the determination obligatory, whether the result reached is right or wrong. (*State* v. *Young,* 134 Iowa, 505; *State* v. *Howard,* 74 Atl. Rep. 392.) In the absence of fraud or mistake, when an officer has acted within the scope of his authority and has exercised his discretion and pronounced a decision, it is so far regarded as judicial that "even though his decision appear to be clearly erroneous he cannot be compelled to correct it." *State* v. *Brown,* 10 Ore. 215; *People* v. *Stephens,* 71 N. Y. 527.

Counsel for appellee insist that the State is estopped at this late date from inquiring into the correctness of these semi-annual statements; that this charter being a contract between the parties, the doctrine of estoppel will apply to the State here as it ordinarily would to a private party. The rule invoked by appellee on this point applies only to those contracts where the State goes into business as a partner with individuals or in competition with her citizens. (*Brown* v. *Trustees of Schools,* 224 Ill. 184; 2 Herman on Estoppel, sec. 1128; 25 Cyc. 1007; 19 Am. & Eng. Ency. of Law,—2d ed.—p. 190.) This charter is not within the class of contracts just referred to. If the State, in

enforcing this contract, acted in its private capacity as distinguished from its governmental capacity, then the doctrine of estoppel might be invoked. (*Barnard* v. *County of Sangamon,* 190 Ill. 116; *City of Chicago* v. *Sexton,* 115 id. 230; *Chicago, Rock Island and Pacific Railroad Co.* v. *City of Joliet,* 79 id. 25.) But the State, in enforcing the provisions of this charter contract, is not acting in its private capacity. The contract has nothing to do with trade relations between private individuals and the government, but is one exempting property from ordinary taxation for an equivalent. The revenue to be paid under this charter is simply a substituted tax,—a special form of taxation (*State* v. *Railway Co.* 128 Wis. 449,) for the benefit of all the people of the State. In attempting to collect this revenue the State is acting in its governmental capacity, the same as when it is attempting to collect taxes under the general revenue laws. This being so, public policy requires that the State shall not lose through the *laches* or negligence of its officers. (*People* v. *Brown,* 67 Ill. 435; *Catlett* v. *People,* 151 id. 16; *Whittemore* v. *People,* 227 id. 453.) While cases may arise of such a character that right and justice will require that equitable estoppel may be asserted even against the State when acting in its governmental capacity, (*County of Piatt* v. *Goodell,* 97 Ill. 84; *Logan County* v. *City of Lincoln,* 81 id. 156; *State* v. *Jackson, L. & S. R. Co.* 16 C. A. A. 345, and note;) no such showing is made here in the bill as will bring this case within that class.

It is further argued that the allegations of the bill are insufficient to justify the requiring of an accounting. The general rule is, that a bill for an accounting must state a plain case. The certainty required, however, need only be such as to apprise the defendant of matters for which he will be called upon to account. (1 Ency. of L. & P. 752, and cases cited.) The courts are liberal in their construction of a bill for an accounting. It will be upheld if it

substantially makes out a case. (1 Ency. of Pl. & Pr. 97.)
The degree of certainty and particularity of the statement
required depends somewhat upon the character of the ac-
counts involved. It is conceded by all parties to this liti-
gation that in number of items, intricacy, detail and extent
the accounts in this case have few, if any, parallels in the
history of American courts. The period covered is thirty
years and the amount alleged to be involved $15,000,000.
As we have seen, the books of account, papers and vouch-
ers referring to the items alleged to be omitted, improperly
entered or improperly reported by appellee are so volumin-
ous and numerous that for the period of any six months
they would occupy the space of an ordinary freight car and
the specific items for any such period would cover many
thousands of pages. The rule in common law pleadings is,
that whenever the enumeration of particulars would lead
to great prolixity a general statement is sufficient. (*Smith
v. Boston, etc. Railroad Co.* 36 N. H. 458.) In an action
on a bond conditioned that one who is appointed agent of
a regiment should pay all such sums of money as he should
receive and to individually account therefor, the defendant
pleaded general performance. Plaintiff replied that the de-
fendant had received from the pay-master several sums of
money, amounting to £7400, for and on account of said
regiment, its commissioned and non-commissioned officers
and soldiers, according to their respective proportions, and
that he had not so paid a great part thereof. Upon de-
murrer the court said: "There was no need to spin out
the proceedings to a great prolixity by entering into detail
and stating the various deductions out of the whole pay,
upon various accounts and in different proportions," and it
was there held that the pleadings were sufficiently specific.
(Andrews' Stephen's Pl.—2d ed.—sec. 223.) The same
rule as to general statements in pleadings to avoid prolixity
applies to pleadings in equity. (Welford's Eq. Pl. *6.)
Even less strictness in pleading is required in equity than

in law. Story's Eq. Pl. (9th ed.) sec. 240; 1 Beach's Eq. Pr. sec. 95; Cooper's Eq. Pl. p. 6.

There is another rule of pleading that applies with full force to the question here under consideration. If a matter essential to the determination of the claims of complainant is charged to rest in the knowledge of the defendant or must of necessity be within his knowledge, and is consequently the subject of a part of the discovery sought by the bill, precise allegations thereof are not required. (Story's Eq. Pl.—9th ed.—sec. 255; Cooper's Eq. Pl. *6; Mitford & Tyler's Eq. Pl. & Pr. p. 137; *Watson* v. *Murray,* 23 N. J. Eq. 257; *Gale* v. *Reed,* 8 East, 80; *Penn* v. *Fogler,* 182 Ill. 76; *West* v. *Brewster,* 1 Duer, 647; *McCall* v. *Moss,* 112 Ill. 493.) All the facts need not be set out in the bill. It is sufficient if general statements of fact are made, under which pertinent details can be proved. *Nesmith* v. *Calvert,* 1 Wood. & Minot, 34; 1 Story's Eq. Pl. (9th ed.) sec. 28.

In this connection it is necessary to consider the question whether fiduciary relations, or relations of a similar character, exist between appellee and the State. It is important to decide this question not only with reference to its bearing on certain allegations in the bill for accounting, but also as to what will justify a court of equity in inquiring into and opening up stated accounts between parties. A bill to require an accounting of a trust fund does not rest upon fraud. The beneficiary has the right to know the actual state of the account in order to reach a settlement. (*Loud* v. *Winchester,* 52 Mich. 174; *Reading* v. *Haggin,* 12 N. Y. Supp. 368.) It cannot be definitely and accurately stated just what will constitute such a relationship. Courts of equity have refrained from stating all the particular instances where such relations arise. The courts have frequently extended some of the principles which control fiduciary relationship to cases where such relations were not involved.

It is not claimed that a partnership existed between appellee and the State under this charter, or that it created, in the ordinary sense, the relation of trustee and *cestui que trust.* It is evident, however, that the parties under this charter are not dealing at arm's length; that the State is largely dependent upon the honesty and fair dealing of appellee as to the correctness of these semi-annual reports; otherwise it would be necessary for the State to keep a large force of employees continually at work checking up, investigating, examining and verifying these statements and comparing them with the books of the appellee in order to know whether they are correct.

In *Western Union Telegraph Co.* v. *Bell Telephone Co.* 125 Fed. Rep. 342, the telegraph company, in order to protect its telegraph business against probable inroads by telephones, leased and transferred to the telephone company certain interests in telegraphic patents and equipments, whereby the telegraph company was to receive certain royalties from the telephone company, the leases requiring that the books be kept by the telephone company and be open to the inspection of the telegraph company. The court there said (p. 345) : "While this contract and lease did not create the technical relation of trustee and *cestui que trust,* it established a *quasi* trust." And again, in considering the construction and effect of the contract, the court said (p. 346) : "We must first of all consider that the relations of the parties to it were of the fiduciary character to which we have referred, so that the telephone company, as the sole holder of the joint interests, left in exclusive control thereof, was bound to the underlying rule that neither directly nor indirectly, nor by any artifice whatever, should the Western Union be deprived of its share of the net profits or licenses on the leases, whatever form they might assume, unless and except as expressly provided." Again, after discussing the question of relations which might arise between others than trustees and *cestuis que trustent,* the court stated

that the general equity controlling such transactions re-
quired the telephone company "to act with utmost good
faith for what concerns the common interests. This equity
is effectual, universal and unyielding, and we must ap-
proach the contract in the light of it and give the Western
Union the full benefit thereof."

A Wisconsin statute required railroads to file with the
State treasurer a true statement of their earnings, for the
purpose of fixing the amount of the license fee to be paid
by them. It was held in *State* v. *Chicago and Northwest-
ern Railroad Co.* 128 Wis. 449, that the relation between the
State and railroad companies under that statute was con-
tractual in its nature. In discussing the obligations resting
upon the railroad companies in making these statements of
earnings, in *State* v. *Chicago and Northwestern Railroad
Co.* 132 Wis. 345, the court said (p. 355): "The relation-
ship of the State and defendant respecting these obligations
is such that there is cast upon the defendant the duty of
keeping a correct account of its gross earnings to enable the
State to ascertain the extent of its credits, and from this
flows the duty of rendering to the State a true and correct
report of these transactions. These circumstances of neces-
sity create a relationship in which the defendant has the
duty of protecting the rights of the State issuing out of the
transaction, by keeping a true and correct record of its
business affairs respecting them and by rendering an ac-
count of its performance of this obligation."

Under its charter appellee was granted by the State, in
square miles, a "body of land that was a principality,—
that in fertility of soil was unsurpassed." The company
was authorized to sell these lands on credit and execute con-
tracts for deeds, and no matter how long the contracts ran,
the land was exempt from taxation until finally conveyed to
purchasers. Appellee has realized from the sale of these
lands over $30,000,000. We cannot agree with its conten-
tion that it is not a beneficiary of the State of Illinois; that

it owes the State nothing for this land grant; that the grant was made by the Federal government to the State only as trustee, to see that the lands were conveyed for the purpose specified. When the lands were ceded by Congress to the State the appellee company was not in existence. It was incorporated five months later. There is nothing in the act of Congress to show that the Illinois Central Railroad Company was ever thought of. (*State Board of Equalization* v. *People,* 229 Ill. 430.) While the grant was made by Congress to aid in constructing railroads, the State of Illinois was left entirely free to determine by whom the road should be built.

In the transactions essential to the performance of this charter contract the parties do not deal at arm's length and upon an equal footing. Trust and confidence must be reposed by the State in the absolute honesty and fair dealing of the railroad company. A fiduciary relation, in the strict use of that phrase, does not exist between the State and appellee. Beyond question, however, the relations between these parties are similar in some respects. The obligation rests upon appellee to make true and accurate statements of its gross receipts to the State. In a proceeding of this kind the relations of the parties under this charter are such that the burden of proof rests upon appellee to show that, such semi-annual statements are true and accurate.

The books and accounts showing the items of gross receipts upon which to base the percentum required by the charter to be paid to the State were all kept by appellee. Appellee is in no position to complain that the bill does not set out specifically all the items of the account when the records as to such items are solely in its possession. If it were held that all of these items as to the specific charges must be set out in the bill, the State would be practically precluded from having these accounts at any time inquired into by the courts. Rules of pleading should facilitate getting at the real facts of an action in a legal, orderly manner,

but should not place practically insurmountable obstacles in the way of investigating such facts. Such rules should promote and not impede the administration of justice. If this were simply a bill for an accounting,—if the question of the semi-annual statements being stated or settled accounts were not in issue,—we should hold, without hesitation, that the allegations of the bill were of such nature and sufficiently specific to require an accounting.

The appellee further insists, however, that these semi-annual statements are shown by the allegations in the bill to be stated accounts, and that a different rule obtains as to the certainty and particularity of the allegations to require opening up and inquiring into such accounts than is required in a bill for a simple accounting. A stated account is an acknowledgment of an existing condition of liability of the parties, from which the law implies a promise to pay the balance thus acknowledged to be due. The terms "stated" and "settled" accounts are sometimes used as equivalent expressions. (1 Cyc. 364, and cases cited; 1 Words and Phrases, p. 93; 1 Ency. of L. & P. 728, and cases cited; *Chicago, Milwaukee and St. Paul Railway Co.* v. *Clark,* 92 Fed. Rep. 968; *McDow* v. *Brown,* 2 S. C. 95.) These terms have been used interchangeably by counsel in their briefs. If the semi-annual reports are stated accounts, they are also, under the facts set up in the bill, settled accounts, hence the terms will be used in this opinion as equivalent expressions. An accounting does not change the character of the claim, but simply settles the amount of the balance due. It is not, strictly speaking, the statement of a new debt but merely the acknowledgment of an old one. (*Chace* v. *Trafford,* 116 Mass. 529; 1 Cyc. 450, and cases cited; 1 Ency. of L. & P. 716, and cases cited.) An account stated is only *prima facie* evidence of its correctness. (*Perkins* v. *Hart,* 11 Wheat. 237; *Gruby* v. *Smith,* 13 Ill. App. 43; 1 Ency. of L. & P. 723; 1 Cyc. 453.) It may be impeached for fraud or mistake. The

general rule is, that in an application to open a stated account the plaintiff must either charge fraud or state particular errors. (*Bruen* v. *Home*, 2 Barb. 586.) If a complainant seeks the aid of a court of chancery under such circumstances, the charges in the bill must be definite and reasonably certain. "If a mistake is alleged it must be stated with precision and made apparent; so that the court may rectify it with a feeling of certainty that they are not committing another, and perhaps greater, mistake. And especially must there be distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was discovered and what the discovery is, so that the court may clearly see whether by the exercise of ordinary diligence the discovery might not have been before made." (*Stearns* v. *Page*, 48 U. S. 819.) "A settled account otherwise unimpeachable, in which an error is proved to exist, may be subjected to a decree to surcharge and falsify, upon the supposition that one error having been proved, others may be expected, upon investigation, to be discovered." (*Coleman* v. *Mellersh*, 2 Mac. & Gord. 309.) "A person seeking to open a settled account must specify in his claim either errors of considerable extent, both in number and amount, or at least one important error of a fraudulent nature." (1 Daniell's Ch. Pl. & Pr. *371.) If gross fraud, gross mistake, undue advantage or imposition are made clear, the court, in some instances, will direct the whole account to be opened and taken *de novo,* on the ground that the inaccuracy or imposition affects or stains all the items of the account. (1 Story's Eq. Jur.—12th ed.—sec. 523.) Fraud or imposition not being shown but only errors and omissions, corrections will be confined to those errors, the burden of proof resting upon the party complaining, to establish them. (*Paulling* v. *Creagh's Admrs.* 54 Ala. 646; *Williams* v. *Savage Manf. Co.* 1 Md. Ch. 306; *Perkins* v. *Hart,* 11 Wheat. 237.) Where parties stand in confidential relations to each other, stated accounts between them will

be more readily opened, and on slighter grounds, than will ordinary stated accounts. (1 Story's Eq. Jur.—10th ed.— sec. 593, note 4; 1 Ency. of L. & P. 727, and cases cited; Story's Eq. Pl.—10th ed.—sec. 800; *Hoyt* v. *Clarkson,* 23 Ore. 51; *Lewes* v. *Morgan,* 5 Price, 42; *Wharton* v. *May,* 5 Ves. Jr. (Sumner's ed.) *27; *Matthews* v. *Wallwyn,* 4 id. 118; *Newman* v. *Paynes,* 2 id. 199; *Revett* v. *Harvey,* 1 Sim. & Stu. Ch. *502.) As fraud may be more easily practiced or mistakes more easily occur when the relation is confidential than when the parties are dealing at arm's length, "reason as well as authority indicates that slighter evidence of fraud or mistake will induce the chancellor to open the settlement and look into the accounts in the one case than in the other." (*Lee's Admrs.* v. *Reed,* 4 Dana, 109.) "Whatever difference exists in the conclusiveness of an accounting, whether by parties between whom a confidential or fiduciary relation exists or between parties acting exclusively in their own interests, does not result from the application of a different rule of equitable relief, but from the nature of the presumptions that arise from the relations of the parties in the respective cases." (*McDow* v. *Brown,* 2 S. C. 95.) The general rule, however, that in order to open a stated account the bill must either charge fraud specifically or point out the particular errors, applies whether the parties have been dealing at arm's length or occupy confidential relations, and the authorities seem to be a unit in holding that mistakes or errors must be specifically alleged and proved. The following are some of the many authorities so holding: 1 Daniell's Ch. Pl. & Pr. (6th ed.) 371; *Seamans* v. *Burt,* 11 R. I. 320; *Chappedelaine* v. *Deschenaux,* 4 Cranch, 305; *Kronenberger* v. *Binz,* 56 Mo. 121; *Brown* v. *Welsh's Exr.* 27 N. J. Eq. 429; *Leycraft* v. *Dempsey,* 15 Wend. 83; *Young* v. *Hill,* 67 N. Y. 162; *Kinsman* v. *Barker,* 14 Ves. Jr. 578; *Shepherd* v. *Morris,* 4 Beav. 252; *Taylor* v. *Hayling,* 1 Cox, 435; *Johnson* v. *Curtis,* 3 Brown's Ch. (Eng.)

223; *Consequa* v. *Fanning,* 3 Johns. Ch. 587; *Phillips* v. *Belden,* 2 Edw. Ch. 1; *Merriweather* v. *Hardeman,* 51 Tex. 436; *Kilpatrick* v. *Henson,* 81 Ala. 464; *Costin* v. *Baxter,* 41 N. C. 157; *Hoyt* v. *Clarkson,* 23 Ore. 51; *Charlotte Oil and Fertilizer Co.* v. *Hartog,* 85 Fed. Rep. 150; *Appeal of Priestley,* 4 L. R. A. (Pa.) 504, and note; *Raht* v. *Union Consolidated Mining Co.* 73 Tenn. 1.

The bill alleges that these semi-annual statements were falsely and fraudulently made and were incorrect, and that appellee knew that fact at the time such statements were made. This is simply the conclusion of the pleader and not such an averment of facts as is required to support an allegation of fraud. (*Sterling Gas Co.* v. *Higby,* 134 Ill. 557; *Davis* v. *Pickett,* 72 id. 483; 1 Beach's Modern Eq. Pr. sec. 86; Fletcher's Pl. & Pr. 136; 12 Ency. of Pl. & Pr. 1020.) The State concedes the correctness of this rule of law, and it is not claimed that there are any facts set out in the bill that will support this general allegation of fraud. Are the allegations as to mistakes of fact sufficiently certain to require the court to compel an investigation as to the correctness of these semi-annual statements?

The bill alleges that the semi-annual reports are not true statements of the gross or total receipts for the six months which they respectively purport to cover; that appellee knew that the total proceeds of said charter lines for said period were more than the amount given in said reports, and that such reports were made for the purpose of defrauding the State out of large sums of money; that thousands of items of receipts were wholly omitted from these accounts and no percentum paid thereon; that hundreds of thousands of items were knowingly entered by appellee at less than the actual amount received and that the difference in the amounts received and amounts entered was never reported to the Governor. The bill contains no express averments that the Governor did not know of the methods used in making the division of proceeds from the

various sources in making up the amount upon which to base the seven percentum to be returned to the State. It is insisted, however, that the bill does aver facts from which no other conclusion is warranted. It is averred that none of the Governors ever examined the books for the purpose of ascertaining the accuracy of the accounts, and that even if these semi-annual statements are held to be stated accounts, they were not in the form required by the charter. Section 18 provides that "for the purpose of ascertaining the proceeds, receipts or income aforesaid, an accurate account shall be kept by said company, a copy whereof shall be furnished to the Governor of the State of Illinois, the truth of which account shall be verified by the affidavits of the treasurer and secretary of such company." It is argued for the State that the affidavits affixed to the statements might well be true and the statements themselves false, as the affidavit only sets forth that the statement is a correct abstract and statement from the books and accounts; that the statement might be a correct statement from the books and the books not be correct. The accounts given to the various Governors have been sworn to by appellee's auditor, vice-president, comptroller or assistant to the president, as the case might be, (only one official signing each,) and never by the treasurer or secretary. The affidavits all state that there was no secretary of the company in this State, but give no reason why the treasurer or secretary did not sign and swear to them. While the form of the affidavit is not in accordance with the charter requirements, that fact is not decisive of the question whether the Governor's action or failure to act makes these reports stated accounts. The State insists that as to many of these semi-annual accounts no action was ever taken except to file them with the Auditor; that while some of the statements were marked "approved," or "examined and approved," or "examined and referred to the Auditor," the dates when they were so marked, taken in connection with the dates when they were

sworn to and sent to the Governor, show that all the Governor ever did was to so mark them with his pen and pass them on to the Auditor.

But it is contended by appellee that the very retention of these accounts for so long a time was, under the authorities, an acknowledgment of their accuracy. (*Murray* v. *Toland,* 3 Johns. Ch. 569; *Lockwood* v. *Thorne,* 11 N. Y. 170; *Mackin* v. *O'Brien,* 33 Ill. App. 474.) In ordinary business transactions, if an account has been transmitted from one individual to another it will be deemed a stated account from the presumed approbation or acquiescence of the parties, unless an objection is made thereto within a reasonable time. (1 Story's Eq. Jur.—10th ed.—sec. 526.) What is a reasonable time within which to make the objection depends on the circumstances of each case, the ordinary course of business and the relationship of the parties. No attempt has been made by the courts to lay down any general rule which will control. When the facts are undisputed the question is for the court, but when the facts are in dispute in a common law action the question should be submitted to the jury under proper instructions. (*Oil Co.* v. *VanEtten,* 107 U. S. 325; 1 Ency. of L. & P. 704, and cases cited.) The longer the time that has elapsed since the transaction occurred the more stringently will the rules of pleading be enforced and the stronger will be the evidence required to make out a case. The presumption will grow stronger as to the approval of the accounts in proportion to the length of the time elapsed since they were rendered, but there is no certain or definite rule as to the time within which an account will be opened. Each case must depend upon the exercise by the court of a sound discretion in view of the particular facts involved. 1 Cyc. 430, and cases cited; *Johnson* v. *Diversey,* 82 Ill. 446; 1 Ency. of L. & P. 729, and cases cited.

The charter required the Governor to examine and approve these accounts. It was his duty to make such in-

quiries as to enable him to act on them intelligently. The fact that these accounts were complicated; that the statements were of such a general nature that it would be impossible to determine from them, alone, what methods were used in dividing the proceeds between the charter and noncharter lines or in making up any of these statements with reference to any of the disputed questions involved in this bill, should have put him on inquiry as to whether or not they were properly made up. (*Farnam* v. *Brooks,* 26 Mass. 212; *Ogden* v. *Astor,* 4 Sandf. 311.) He had the authority, under the charter, to obtain the necessary information to test the accuracy of these accounts. The presumption is that each Governor did his duty and that the necessary examination was made. (*People* v. *Michigan Central Railroad Co.* 145 Mich. 140; *Philadelphia* v. *Commonwealth,* 52 Pa. St. 451; *People* v. *Martin,* 19 Colo. 565; *Hancock* v. *McKinney,* 7 Tex. 384; *Barron* v. *Kaufman,* 115 S. W. Rep. 787; *Durham* v. *People,* 67 Ill. 414; *Pacific Hotel Co.* v. *Lieb,* 83 id. 602; *City of Peoria* v. *Central Nat. Bank,* 224 id. 43.) This presumption will not be overcome by the general averment in the bill that the Governor made no examination of the books of account of appellee to test the correctness of the accounts, nor by the claim of the State that some of these semi-annual statements show on their face that the Governor did not have time, after they were presented to him, to make any examination. The presumption that the Governor did his duty cannot be overcome by mere inference. He was free to act on whatever, in his judgment, was sufficient. After he had once investigated the methods of making up these statements it would hardly be expected that every six months he would reexamine the methods as to making up each statement with the same thoroughness and care that he did when he first informed himself on the subject. Is it to be 'presumed, without any specific allegation to that effect, that the Governors were not informed on these various subjects? We

cannot so hold. These statements have been made semi-annually and the amounts stated therein to be equal to seven per cent of the gross proceeds of appellee promptly paid and (previous to 1905) accepted by the State officials without objection as to the accuracy of the statements. So far as the allegations of the bill disclose, no objection was ever made as to the proper amounts not being paid or that there were any errors in making up the statements, until a short time before the filing of this bill. It is a wise and salutary provision of the law that discourages claims not promptly 'made, where there has been no personal disability or other impediment in the way of asserting them. It is neither just nor equitable for a party to lie by for years after an account has been rendered to him, and then seek to get rid of such acquiescence by alleging want of information when he might have called for and obtained the same. (*Ogden* v. *Astor,* 4 Sandf. 311.) Lapse of time necessarily obscures the truth and destroys the evidence of past transactions. Courts of chancery will exercise great caution, therefore, in sustaining bills which seek to disturb long settled accounts. (*Stearns* v. *Page,* 48 U. S. 819.) Chief Justice Marshall said in *Chappedelaine* v. *Deschenaux,* 4 Cranch, 305: "No practice could be more dangerous than that of opening accounts which the parties themselves have adjusted, on suggestions supported by doubtful or by only probable testimony." The whole labor of proof lies upon the party objecting to the account, and errors which he does not plainly establish cannot be supposed to exist.

In contracts of this nature, between the State and a corporation or individual, the utmost good faith should characterize the conduct of all the parties. They should be enforced in such a spirit as to do justice not only to the State but to the individual. (*State of Indiana* v. *Milk,* 11 Fed. Rep. 389; *Walker* v. *United States,* 139 id. 409; *Cahn* v. *Barnes,* 5 id. 326; *Commonwealth* v.

*Johnson,* 33 Gratt. 294.)   While courts of equity will grant relief from the consequences of any mistake of fact which is a material element of the transaction and is not the result of the mistaken party's own violation of some legal duty, (2 Pomeroy's Eq. Jur.—2d ed.—sec. 852,) or from imposition or fraud, and mere length of time without *laches* will not purge the fraud, (*Alden* v. *Gregory,* 2 Eden, 280,) yet these rules will not relieve the party from alleging in his bill the particular and specific facts relied upon to show fraud or mistake. This doctrine applies with special force when stated accounts are sought to be opened up. The Attorney General in his oral argument conceded this to be the law. He stated: "If they [the semi-annual statements] are stated accounts I concede that this bill is insufficient and these demurrers should be sustained." The principal argument urged in support of the State's position that these semi-annual statements are not stated accounts is, that the Governor could not, under the charter, finally approve them. We have held the charter gave the Governor this power.

On principle and authority, therefore, we are compelled to reach the conclusion that these semi-annual statements filed previous to the year 1905,—the payments of the amounts shown to be due thereon having been accepted without objection on the part of the State,—must be held to be stated accounts. It necessarily follows that the allegations of the bill are not sufficient to authorize a court of equity to open up and inquire into these semi-annual statements for the years in question.

The allegations, however, of the bill with reference to the semi-annual statements filed in 1905 and 1906 differ materially from those as to previous years in this: that in the earlier years it is simply alleged that the various Governors made no examination of the books of account or statements with a view to verifying the accuracy of such statements, while the bill alleges that for the years 1905 and 1906 the Governor to whom such statements were

made and returned by appellee made a sufficient examination of such statements and the books and papers to ascertain that said statements, and each of them, were false and inaccurate, and that in no one of said semi-annual statements was the true amount given of the gross proceeds, receipts or income of said charter lines for the six months covered by the statement, and that the Governor ascertained that the amount of the gross receipts of the charter lines given as the amount in each of the semi-annual statements made to him during the years 1905 and 1906 was much less than the true amount; that the Governor objected to each of said statements on the ground that they were false and inaccurate and that appellee was given due notice of said objections; that the Governor has at no time assented to the accuracy of said statements filed in 1905 and 1906. As the demurrers admit the truth of the allegations, these semi-annual statements filed in 1905 and 1906 cannot be held to be stated accounts. The property of appellee was listed for those years with the Auditor and the tax assessed by him, as is required by the charter. It appears, however, that these taxes were paid by the appellee as a part of the per cent on its total proceeds due the State. Both parties, under this charter, waived the payment of these taxes during these years in the regular way. The amount of the State tax for the year 1905 was $154,111.87 and the amount for the year 1906 was $155,692.28. The bill shows that for each of these years over a million dollars was paid to the State as and for the seven per cent on the total receipts of appellee. As the State raises no question that more than seven per cent should be paid, it is manifest that appellee has not been injured in any way by the payment of the State tax as a part of the seven per cent. Equity seeks the substance and not the form. Regardless of what the holding of the court might be with reference to the State tax for any year when the property of appellee has not been listed with or assessed by the Auditor, appellee,

under the facts alleged, cannot raise any question as to the method of paying these taxes for the years 1905 and 1906. The averments of the bill show not only that the accounts were complicated but that relations similar to fiduciary existed between the parties. They are therefore sufficiently certain to require an accounting on the part of appellee for the years 1905 and 1906. (1 Ency. of Pl. & Pr. p. 98.) Furthermore, many of the questions in dispute pertain to the methods that should be used in fixing the total receipts of appellee after division of the joint earnings of the charter and non-charter lines. In making a division of these joint earnings appellee is merely dealing with itself. The rights of third parties cannot be concluded by its finding on such questions. When a party thus deals with himself, the burden is on him to show that the transaction is fair and equitable. (*Steenerson* v. *Great Northern Railroad Co.* 69 Minn. 353.) For this, as well as for the other reasons given, the allegations of the bill are sufficient to require an accounting for the years 1905 and 1906. It is therefore unnecessary to consider further the demurrer to the entire bill or to discuss more particularly the general allegations of the bill. The rule is, that if any part of a bill as to relief or discovery is sufficient, the demurrer, being entire, must be overruled. (1 Barbour's Ch. Pr. book 1, chap. 8, p. 107; 1 Daniell's Ch. Pl. & Pr.—6th ed.—sec. 584; 1 Beach's Modern Eq. Pr. sec. 247; Story's Eq. Pl.— 10th ed.—sec. 443.) As demurrer No. 2 questions the sufficiency of the bill to open up stated accounts only as to the years prior to and including 1904 it should be sustained. Demurrer No. 1 is to the entire bill and should be overruled.

Every question raised by the special demurrers of appellee as to the proper construction of its charter will need to be decided in order to reach a proper accounting, under the allegations of the bill, for the years 1905 and 1906. We will therefore proceed to consider and decide these questions.

## Division of Joint Earnings.

The bill alleges that it is the duty of appellee to make a division of its traffic earnings between the charter and non-charter lines upon some fair and equitable basis; that the only fair and equitable method of division is in accordance with the number of miles such traffic is transported over such charter and non-charter lines, respectively. The bill then states at length the various methods claimed to have been used by appellee in dividing such traffic earnings, giving many detailed examples illustrating the various methods. Appellee filed four separate special demurrers questioning the sufficiency of the allegations of the bill on this question of joint traffic earnings. One of the demurrers related to receipts from traffic over charter lines and the lines west of the Mississippi river; a second, to receipts from traffic carried over charter lines and the lines south of the Ohio river; a third, to the receipts from traffic over charter lines and Illinois non-charter lines; and the fourth questioned the entire claim of the State as to the mileage basis being *prima facie* the proper basis for dividing such joint earnings.

The bill alleges that from the time appellee's railroad was completed, down to 1867, no other railroad was owned or operated or leased and operated by the appellee; that in 1867 the Dubuque and Sioux City Railroad Company leased its line of road to appellee for twenty years, with the option to take over such road in perpetuity under certain conditions, the lease providing that joint earnings of traffic over the leased and charter lines should be divided upon a mileage basis; that in October, 1870, the Iowa Falls and Sioux City Railroad Company leased 183 miles of its line to the appellee on the same terms; that both of these leases were to expire on October 1, 1887, but prior to that date appellee began purchasing the capital stock of said companies (which had been consolidated under the name of the Dubuque and Sioux City Railroad Company) and

acquired a controlling interest therein, and that thereafter appellee divided the joint earnings between its charter lines and said Dubuque and Sioux City Railroad Company on another basis different from the mileage basis. It is further alleged that for years preceding the filing of this bill appellee followed the method of dividing joint traffic earnings on the basis of constructive rather than actual mileage; that in order to do this, a non-charter line was arbitrarily divided into blocks of fifty miles and each station within a given block, regardless of how far the traffic was required to move within the block to reach such station, was credited with the entire mileage of the block; that in the division of the earnings actual mileage was used for the charter lines and constructive mileage for the non-charter lines; that on all joint traffic moving between Chicago and points west of the Mississippi river (after deducting a bridge arbitrary of two cents per hundred pounds for the Dubuque bridge and otherwise apportioning the mileage) thirty per cent of the joint earnings was arbitrarily taken from the amount credited to the lines east of the Mississippi river and given to the lines west of the Mississippi; that in every instance this percentum was taken out of the charter line share; that on freight traffic between Chicago and Dubuque, Iowa, in accordance with these methods the joint earnings have been proportioned fifty-five per cent to the charter and other lines east of the Mississippi river and forty-five per cent to the non-charter lines west of the Mississippi; that if the earnings were apportioned according to actual mileage, ninety-five per cent would go to the charter and other lines east of the Mississippi and five per cent to the non-charter lines west of the Mississippi. The bill further alleges that on the joint earnings north and south, *via* Cairo, the basis of the division that has been practiced for years immediately preceding the filing of this bill, (after first wrongfully deducting a bridge arbitrary of two cents per hundred pounds,) while not always uniform, generally

speaking has been the "rate pro rata basis," by which is meant a division of the earnings between charter and non-charter lines for traffic transported from a point on one line to a point on another, in accordance with and in the same. proportion as the local rates in force at the time of the shipment on the respective lines; that in accordance with this method of division, on freight traffic between Chicago and Jackson, Mississippi, the earnings have been proportioned, after deducting the bridge arbitrary, thirty-four per cent to the charter and sixty-six per cent to the non-charter lines, whereas if the division had been according to a fair, equitable apportionment on the actual mileage basis it would have been fifty per cent to the charter and fifty per cent to the non-charter lines; that on the freight traffic between Chicago and Martin, Tennessee, in accordance with the methods of division set forth, (after deducting bridge arbitraries,) fifty-three per cent has been credited to the charter lines and forty-seven per cent to the non-charter lines, when, if the earnings had been divided according to actual mileage, the division would have been eighty-seven per cent to the charter lines and thirteen per cent to the non-charter lines. The bill further alleges that in the methods and practices of dividing joint earnings there has been no uniformity and no fixed principles; that in many instances the same rule has not been applied in proportioning the earnings between a point on the charter line and different stations on the non-charter lines; that in the month of August, 1899, the total earnings on freight between Chicago and Thawville, Illinois, on appellee's Chicago and Springfield branch, were $284.54, and such earnings were arbitrarily apportioned by appellee, to the charter lines (eighty-one mile haul) $133.92 and to non-charter lines (nine mile haul) $150.62, when, if the proportion had been made according to actual mileage, $256.09 would have been proportioned to the charter lines and $28.45 to the non-charter lines. The bill further alleges that appellee has

habitually, for years past, adopted various schemes and devices which have served to minimize and reduce the gross receipts of the charter lines and increase those of the non-charter lines, which resulted in crediting to the charter lines a much less sum than was just, fair and equitable and a much less sum than would have been credited to said lines had the apportionment been on the mileage basis, and "that no special circumstances exist with reference to any of the non-charter lines which would make it fair, just and equitable to divide said income on any other basis than according to mileage."

We have not attempted to set out in detail all the various allegations in the bill as to the division of joint traffic earnings between the charter and non-charter lines. We have, we think, set out sufficient specific allegations of fact, as well as general averments, to show the basis upon which the allegations of the bill on this subject rest. Is the mileage basis *prima facie* a fair and equitable method of dividing joint traffic earnings?

In the case of *Ackley* v. *Chicago, Milwaukee and St. Paul Railway Co.* 36 Wis. 252, the court had under consideration the Wisconsin statute of 1874, which fixed a minimum charge as to two or more railroads but made no provision how this charge should be divided between the different roads. The court held that it should be divided on some equitable principle to be determined by the courts in case the companies invoked their aid. Subsequently, in *Rood* v. *Chicago, Milwaukee and St. Paul Railroad Co.* 43 Wis. 146, the court said (p. 155): "It is also proper to say that the equitable principle of divisions between railway companies, under the statute of 1874, where two or more companies carried goods over their own roads as one carriage, intended by the court in *Ackley* v. *Railway Co.* 36 Wis. 252, was the distribution, *pro rata,* of the aggregate rates of the statute according to the length of carriage by each company. As between themselves, the companies

could agree upon any other rule of distribution. But this was adopted as the legal rule." .

In *State* v. *Railway Co.* 128 Wis. 449, it was stipulated by the parties to that litigation that for the purpose of paying a license fee to the State the division of the gross earnings of certain railways for 1902 on freight across the State, or from points outside to points within the State, or *vice versa,* should be made in proportion to the actual miles of carriage in and out of the State in each instance, and that the division of such inter-State commerce had been proportioned in the same way continuously since 1876. Joint earnings have frequently been divided between railroad companies on the mileage basis. *Archer* v. *Terre Haute and Indianapolis Railroad Co.* 102 Ill. 493; *Railroad Co.* v. *Railway Co.* 44 Ohio St. 287; *Pullan* v. *C. & C. Air Line Railroad Co.* 5 Biss. 237; *Central Trust Co.* v. *Wabash, St. Louis and Pacific Railroad Co.* 30 Fed. Rep. 332.

In *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* v. *Backus,* 154 U. S. 421, the court, after reviewing many authorities, held that where a railroad ran through different States, a tax upon its franchise or income in one of those States was properly based on such proportion of the whole income or value of the road as the length of the road within the State bore to the whole length of the road. The court further said (p. 431) : "It is true there may be exceptional cases, and the testimony offered on the trial of this case in the circuit court tends to show that this plaintiff's road is one of such exceptional cases, as, for instance, where the terminal facilities in some large city are of enormous value, and so give to a mile or two in such city a value out of all proportion to any similar distance elsewhere along the line of road, or where in certain localities the company is engaged in a particular kind of business, requiring for sole use in such localities an extra amount of rolling stock."

In *Adams Express Co.* v. *Ohio State Auditor,* 165 U. S. 194, the court held that the mileage basis for the division of the property of an express company was proper in finding a value upon which to levy a tax upon such company, and stated (p. 227): "It is for the companies to present any special circumstances which may exist, and failing their doing so, the presumption is that all their property is directly devoted to their business, which being so, a fair distribution of its aggregate value would be upon the mileage basis."

In *Fargo* v. *Hart,* 193 U. S. 490, it was held that it was reasonable and constitutional to get at the worth of the property of an express company, in the absence of anything more specific, by mileage proportion; that "so long as it fairly may be assumed that the different parts of a line are about equal in value a division by mileage is justifiable," but that special circumstances might require a different method to be used.

In *State* v. *Express Co.* 100 Me. 278, the court held that in determining the amount of a tax on express business done in the State, it was proper, in levying a tax thereon, to apportion the earnings by prorating according to the miles within and those without the State. The mileage basis for division has also been used in some form in the following cases: *Commonwealth* v. *Fall Brook Railway Co.* 188 Pa. St. 199; *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Backus,* 154 U. S. 439; *Ohio and Mississippi Railroad Co.* v. *Weber,* 96 Ill. 443; *State* v. *P., W. & B. R. R. Co.* 45 Md. 361.

The courts and other public authorities have been called upon frequently in recent years to consider the apportionment of rates for traffic carried over different lines of railroad. In *Bulte Milling Co.* v. *Chicago and Alton Railroad Co.* 15 I. C. C. Reps. 351, it is said: "The commission has had frequent occasion to say that the rate per ton per mile is not the generally accepted basis for making up

rates, so, far, at least, as inter-State movements are concerned, and we know of no well informed shipper or student of transportation who is ready to advocate the mileage system in this country."

In *Birmingham Packing Co.* v. *Texas and Pacific Railroad Co.* 12 I. C. C. Reps. 500, it is said (p. 502) : "Considering the terminal charges of the receiving and the delivering lines and the ferry charge of the intermediate line, we are of the opinion that in the case before us this rate will be fairly divided upon a mileage basis, and shall so order. This conclusion applies, however, only to the peculiar facts of this case, and must not be taken as implying that the commission is of the opinion that joint rates established by it should necessarily be divided upon that basis."

In *Star Grain and Lumber Co.* v. *Atchison, Topeka and Santa Fe Railway Co.* 14 I. C. C. Reps. 364, the commission said (p. 370) : "It is the duty of the commission, in fixing divisions, to take into consideration all the circumstances, conditions and equities that are necessary to arrive at what is a fair and proper adjustment of the situation as between the two roads, and precludes the idea that joint rates must be divided between the participating carriers on a mileage or any other fixed basis."

In *Smyth* v. *Ames,* 169 U. S. 466, in considering the question of rates and the comparison thereof between the States of Nebraska and Iowa, the court said (p. 540) : "The question is asked, are not the people of Nebraska entitled to as cheap rates as the people of Iowa? Of course, relatively they are. That is, the roads may not discriminate against the people of any one State, but they are not necessarily bound to give absolutely the same rates to the people of all the States, for the kind and amount of business, and the cost thereof, are factors which determine largely the question of rates, and these vary in the several States. The volume of business in one State may be

greater per mile while the cost of construction and maintenance is less, hence to enforce the same rates in both States might result in one in great injustice, while in the other it would only be reasonable and fair. Comparisons, therefore, between the rates of two States are of little value unless all the elements that enter into the problem are presented."

In *Steenerson* v. *Great Northern Railway Co.* 69 Minn. 353, the court had under consideration the question as to whether railroad rates established by the State authorities were confiscatory, and said (p. 393): "It may well be that for the purpose of taxation, under the constitution and laws of this State, such gross earnings should be divided on one basis, and that for the purpose of determining whether the rates fixed are confiscatory, the net earnings on such through business should be divided on some other basis. * * * It will be observed, therefore, that the traffic on these lines is considerably more than twice as heavy in Minnesota as it is beyond the State. Under these circumstances a division of the gross earnings on the mileage basis is neither just nor reasonable. Operating expenses are proportionately higher on the portion of the road having the least business. Besides, higher rates must be charged on the business of that portion of the road in order to make a reasonable income on the cost of reproducing it. Therefore, if the business is divided on the mileage basis, it may give Minnesota the benefit of high rates charged elsewhere which the railway company is not entitled to charge in this State." Again, in the same opinion it is said (p. 396): "In determining what is a proper adjustment of rates as between the different portions of the system every case must depend on its own circumstances."

In reaching a conclusion as to what is a proper rate to charge, and the division of rates between constituent companies, it has been held necessary to take into consideration the length of the haul, the lightness of the train loads,

246—17

the expense of billing and handling the traffic, the amount of the traffic, the season of the year, whether it is local or through freight, the weight and bulk of the goods, and other items and elements that enter into what should be a proper and reasonable charge for the freight carried and a proper division between different lines over which it has been carried. (Beale & Wyman on Railroad Rate Regulations, chap. 15; Noyes on American Railroad Rates, p. 43; 2 Hutchinson on Carriers,—3d ed.—secs. 531-534, inclusive; *Northern Pacific Railway Co.* v. *Keyes,* 91 Fed. Rep. 47; *Inter-State Commerce Commission* v. *Lehigh Valley Railroad Co.* 74 id. 784; *Ames* v. *Union Pacific Railroad Co.* 64 id. 165.) While mileage is not necessarily controlling in determining the reasonableness of rates, it is an important factor. (*Railroad Co.* v. *Minnesota,* 186 U. S. 257; 2 Hutchinson on Carriers,—3d ed.—secs. 532, 579.) The presumption is that the rates fixed by a State commission are reasonable, and the burden of proof is upon the railroad company to show to the contrary; and this burden would be cast upon the railroad company without the aid of any statute. (*Steenerson* v. *Great Northern Railway Co.* 69 Minn. 353.) A mileage basis for fixing ordinary taxes on the property of a corporation might be the only practical method, when such a basis would be inequitable and unjust for a division of the joint earnings.

From what has been said it is manifest, under the authorities, that just and reasonable rates are not necessarily based on the cost of service; that terminal expenses are usually not affected in the slightest degree by distance; that the density of traffic may be an important factor in deciding on the proper rate to be charged, and that a railroad may be more profitably operated with heavy than with light traffic; that the cost of transportation does not vary in proportion to the distance carried; that the cost of construction and operation of railroads widely varies, one railroad being built over mountains and another across a

prairie.  Rules for the division of joint traffic between the
charter and non-charter lines must necessarily be based on
experience.  They must be formed as a result of knowl-
edge of the actual movement of traffic and be determined
thereby.  They must take into account the average haul on
the charter lines and on the non-charter lines; the compar-
ative cost of doing business on the respective lines; the
density of traffic, and all other factors that experience has
shown are necessary to be considered in order to reach a
fair division of the joint earnings.  Justice to the State
as well as to appellee requires that all of these different
elements making up the cost of transportation should be
taken into consideration in dividing such joint earnings, in
order to reach a proper basis for fixing an amount on which
the percentum is to be paid to the State.  It is clear, there-
fore, that the mileage basis is not the only fair and equitable
one for the division of joint earnings.  If, however, the
State, on the hearing in this proceeding, should prove that
certain charges were made for carrying goods partly over
the charter lines and partly over the non-charter lines, the
court, in the absence of any other proof on that point, would
be justified in dividing these joint charges *pro rata,* accord-
ing to the length of the carriage over the respective lines.

The appellee further contends that the method of divi-
sion of joint earnings used by the appellee must be held
to be fair and equitable, because, appellee alleges, it has
been practiced and recognized for many years by both the
State and appellee.  We cannot assent to this contention.
Because, for example, the lease made in 1867 between ap-
pellee and the Dubuque and Sioux City Railroad Company
divided joint earnings on the mileage basis, it does not
necessarily follow that under the varying conditions that
arose twenty years later the joint earnings should be con-
tinued to be divided on the same basis.  Manifestly, the
State cannot be bound in the future by the practices that
have obtained in the past, because the conditions upon which

such divisions were made have radically changed. If, however, the proper officials of the appellee company have in good faith entered into contracts with other railroads as to joint earnings between such companies and itself, the State cannot arbitrarily require the repudiation of such contracts in a division of joint earnings between such companies in order to fix the amount of the State's percentum.

There being no question of stated accounts for the years 1905 and 1906, the allegations of the bill are sufficient to require an accounting by appellee as to the division of the joint earnings for those two years, and the burden of proof rests upon appellee to show that the division that has been made is fair and equitable for the fixing of the State's percentum. Demurrers 4, 5, 6 and 7 should be overruled.

### *Express Earnings.*

The State further claims that there has not been any proper division between the charter and non-charter lines of the express earnings received by appellee from express companies. The bill alleges that various express companies, in pursuance of the rights and privileges granted by appellee through certain leases and agreements, have transported over the charter and non-charter lines of appellee, during the years in question, express matter and paid to appellee large sums of money each year, the amounts of which are unknown to the State; that such earnings should have been fairly proportioned between the charter and non-charter lines on a mileage basis; that appellee should have made a statement which would have enabled the State to ascertain what portion of said express receipts should in fairness and equity be apportioned to the charter and what to the non-charter lines, but has failed and neglected so to do; that appellee has always arbitrarily, fraudulently, willfully and illegally apportioned and credited to the account of the gross or total proceeds, receipts or income of the charter lines a proportionate amount which was not based

upon any equitable principle but was less than the amount which should have been credited to the charter lines, and that appellee knew this fact; that such express earnings should be divided between the charter and non-charter lines in the proportion that the express earnings of appellee's entire system bears to the express earnings on said charter lines; that the State does not know, and is unable to ascertain, what amount of express matter is handled by appellee or upon what terms.

The chief, if not the sole, answer of counsel for appellee with reference to the allegations of the bill on the division of express earnings is, that such allegations are not sufficiently specific to justify the opening up of stated accounts. As that question is now out of the case it is unnecessary to discuss it. We deem these allegations sufficient to require an accounting by the appellee for the years 1905 and 1906. These express earnings should, for the purpose of ascertaining the amount to be paid to the State, be divided between the charter and non-charter lines on some just, fair and equitable basis. We are disposed to hold that the mileage basis would not in all cases be the fair and equitable basis for such division. The rules of law that have been considered as controlling the division of joint traffic earnings apply with equal force to the division of express earnings between the charter and non-charter lines. We will therefore not be required to discuss or review the authorities on this question. Demurrer No. 12 filed by appellee should be overruled.

### Drayage and Switching Charges.

Another claim of the State is based on the allegations of the bill that the State is entitled to a percentum of the amounts allowed other corporations for their services in carrying freight, by dray or otherwise, between other freight houses and the depots of appellee, and for transportation on the railroad tracks of such other corporations,

to consignees located thereon, of loaded cars taken to or from Chicago by appellee over the charter lines.

It appears that there is no direct connection by rail between the depots and freight houses of appellee and the depots and freight houses of some of the other railroads in the city of Chicago; that between these depots the freight is transferred by wagons or drays, and that whenever this is done the drayage charge is deducted from the gross freight earnings, and that these charges are not collected from the shippers as an extra expense but are deducted from earnings produced by the application of the ordinary and usual rates and before the earnings are divided between the charter and non-charter lines, and that the same practice obtains as to the switching charges when other railroads transfer loaded cars from appellee's charter lines to consignees located on the lines of such other railroads. The bill alleges that the cost of these draying and switching charges was simply expense connected with the operation of appellee's system of railroads and did not add to the charges collected from the shippers of such freight. Appellee contends that the expense attending the transportation of this freight by dray or rail was an allowance made to the other companies for their services in that regard and had nothing to do with the expenses of the movement of such traffic over appellee's charter lines, while the Attorney General insists that the only question to be decided is whether these expenses or allowances were, and should properly be, deducted from the gross receipts of the charter lines; that if they were so deducted, the amount or percentum paid to the State was based and computed, not upon the gross but upon the net receipts, so far as concerned these items.

While there may be some force in the contention of appellee that the averments of the bill tend to contradict themselves on this question, we are disposed to hold that the allegations are sufficient to require an accounting on this

question by appellee for 1905 and 1906.  The State, however, under the charter, is entitled to receive its percentum only on "the gross or total proceeds and receipts or income derived from said road and branches."   If, on a hearing, the contention of counsel for appellee is shown to be true that these draying and switching charges are not deducted from earnings which accrued to the charter lines for any services performed by them but for earnings accruing to other companies for distinct and independent services, (even though appellee collected the entire charge to the point of destination, not only for the transportation over its own lines but for the drayage and switching in question,) such draying and switching charges would not be a part of the gross proceeds or receipts of the charter lines as those terms are used in the charter.   In case the draying and switching services were performed by appellee, and not by other corporations, as a necessary incident and solely for the purpose of enabling the appellee company to perform its duty as a common carrier over its charter lines, then whatever such services were worth should be credited to the charter line receipts in fixing the State's percentum. Demurrers Nos. 13 and 26 should be overruled.

### *Free use of Charter Line Property for the Benefit of the Non-Charter Lines.*

It is further claimed on behalf of the State that appellee has used its charter line property for the benefit of non-charter line property without charging therefor; that all the engines and cars owned by appellee belong to and are a part of the charter line equipment; that the depot, freight houses and terminal facilities in Chicago, and all depots, switch tracks and sidings at junction points between the charter and non-charter lines, are the absolute property of the charter lines; that appellee has hauled and transported over the charter lines large quantities of coal, iron and other materials and supplies for the sole use and bene-

fit of the non-charter lines without crediting to the charter lines any earnings on account thereof; that engines and cars belonging to the charter lines have, from time to time, been devoted to the sole and exclusive use of the non-charter lines and no earnings whatever credited therefor to the charter lines; that certain of the non-charter lines have had the use, free of charge, of all the charter line terminal facilities in the city of Chicago, consisting of the passenger depots, freight houses, storage, transfer and cleaning yards, round-houses and shops, team tracks and switching tracks, and clerical services necessary for the employment of such facilities, and have also had the use, free of charge, of the charter line depots, side-tracks, terminal facilities and office equipment at junctions between the charter and non-charter lines, outside of Chicago; that the charter lines would have derived certain sums for these services if the usual charge had been made, and that it was the duty of appellee to keep accounts showing the amount of coal and other supplies transported, and the amount which would ordinarily be charged for the use of such cars, engines, terminal facilities, etc., by the non-charter lines, and credit the amount of the gross income of the charter lines with the usual amount which would have been charged by appellee had such services been performed "for foreign (independent) lines of railroad." Appellee's answer to this claim is, that the provisions of the charter were not intended to include such services as a part of the gross proceeds, income or receipts of the appellee's charter lines for measuring the State's percentum. Counsel for appellee insist that one of the considerations for the acceptance of this charter was the granting of authority to the appellee to own and operate its railroad; that among the powers vested in appellee was the making of contracts with other corporations for terminal facilities; that appellee could have contracted with the original owners of the non-charter lines to give them the free use of such terminal

facilities, and, except as prevented by statutes against rate discrimination, to haul, free of charge, all business received by them; that the terms of such contracts, in the absence of bad faith on the part of appellee, would be within its discretion; that if such traffic contracts were made with independent railroads or with non-charter lines, in neither instance would any sum be received for the mutual services, and if a charge were made on the books of appellee company it would be a mere matter of book-keeping, without any addition to the funds of appellee.

We cannot yield our assent to appellee's construction of the charter on this subject. Beyond question, appellee has the authority, in good faith, to make such traffic arrangements between the charter and non-charter lines or between the charter lines and independent railroad companies, but it cannot, in so doing, lessen the gross proceeds and receipts upon which the State's percentum is computed. Such authorities cited by appellee as *Louisville and Nashville Railway Co.* v. *Commissioners,* 19 Fed. Rep. 679, which holds that a State cannot, under the pretense of necessary police regulation, interfere with the vested rights of a company, granted by its charter, to fix its rights of toll; or such authorities as *Green Bay Railroad Co.* v. *Union Co.* 107 U. S. 98, and *Morris and Essex Railroad Co.* v. *Sussex Railroad Co.* 5 C. E. Green, 542, which hold that railroads, under their charters, can contract with independent companies to haul, free of charge, the supplies of such independent companies in return for delivery to the railroad company in question of traffic controlled by them, are not in point on the question now under consideration. So, also, are plainly distinguishable such authorities as *Day* v. *Ogdensburgh Railroad Co.* 107 N. Y. 129, and *New York, Lake Erie and Western Railroad Co.* v. *Nickals,* 119 U. S. 296, which, in effect, hold that bondholders of a corporation cannot complain of such traffic arrangements, made in good faith, because they affect the earnings of the company.

Section 7 of appellee's charter provides, among other things, that the directors are authorized to do certain things pertaining to the construction of the road and the transportation of persons and merchandise thereon, "with all such powers and authority for the control and management of the affairs of said company as will be necessary and proper to carry into full and complete effect the meaning and intent of this act." The intent of the charter was to aid in the construction of a railroad, and through its operation to secure the State, for all time, seven percentum of the gross receipts of said charter lines. The charter, in referring to the standard by which to measure the State's percentum, in section 18 used in one place the words, "five percentum on the gross or total proceeds or income derived from said road and branches." Again, in the same section we find the words, "for the purpose of ascertaining the proceeds, receipts or income aforesaid, an accurate account shall be kept by said company." In section 22 we find the following: "Whenever the taxes levied for State purposes shall exceed three-fourths of one per cent per annum, such excess shall be deducted from the gross proceeds or income herein required to be paid by said corporation to the State." In the same section we find: "The revenue arising from such taxation, and the said five per cent of gross or total proceeds, receipts or income aforesaid, shall be paid into the State treasury in money." The final statement of the charter on this question is the closing provision of said section 22, which reads: "In case the five per cent provided to be paid into the State treasury and the State taxes to be paid by the corporation do not amount to seven per cent of the gross or total proceeds, receipts or income, then the said company shall pay into the State treasury the difference, so as to make the whole amount paid equal at least to seven per cent of the gross receipts of said corporation."

All counsel agree that the terms "gross proceeds" and "gross income" mean the same thing in this case as "gross

receipts." But counsel for appellee insist that as these three phrases mean the same thing they should be fairly construed to mean the same as "gross earnings," which term, they argue, is ordinarily construed to mean "gross income," and that "gross income" means "gross increase" or "gross gain," while counsel for the State insist that the words "gross receipts," being the last phrase used in the proviso at the end of said section 22, indicate that that term was intended to include all the others, and manifestly means the total receipts of said charter lines and its branches, without any deductions for expenses for any purpose. All three of these phrases, "gross income," "gross proceeds" and "gross receipts," are of equivocal import. Their construction and meaning will depend much upon the context and the special matter to which they are applied. (23 Am. & Eng. Ency. of Law,—2d ed.—p. 159, and cases cited; 4 Words and Phrases, pp. 3174, 3501-3507, inclusive; 6 id. pp. 5639-5642.) In *Commonwealth* v. *United States Express Co.* 157 Pa. St. 579, the court held that a tax on gross receipts meant a tax upon the total receipts and not upon the net earnings or the gross earnings of the express company's business, less the amount paid to other companies for transportation services. In *German Alliance Ins. Co.* v. *Van-Cleave,* 191 Ill. 410, this court held that it appeared to be the intention under a certain law to levy a tax on the "gross income" of foreign fire insurance companies, and that this required such companies to pay a tax "on the gross receipts of their business." See, also, *Goldsmith* v. *A. & S. R. R. Co.* 62 Ga. 468; *Railway Co.* v. *Shinn,* 52 Ark. 93; *People* v. *Roberts,* 92 Pa. St. 407; *Philadelphia and Reading Railroad Co.* v. *Commonwealth,* 104 id. 80; *People* v. *Morgan,* 99 N. Y. Supp. 711; *Remington* v. *Field,* 16 R. I. 509.

In *Union Pacific Railroad Co.* v. *United States,* 99 U. S. 402, the court had under consideration the question as to what were the net earnings for five per cent of which

the company became liable to account, and held that they embraced "all the earnings and income derived by the company from the railroad proper and all the appendages and appurtenances thereof, including its ferry and bridge at Omaha, its cars, and all its property and apparatus legitimately connected with its railroad." The opinion also held that compensation accruing to the railroad company for services performed for the United States government should be taken into account in measuring the net earnings, notwithstanding the fact that the government did not pay such compensation directly to the railroad, but applied it, under the provisions of the charter, to the payment of subsidy bonds. In *State* v. *Minnesota Railway Co.* 106 Minn. 176, it was held that the pay for the switching of cars for a lumber company, for the use of steam shovels, work trains and other equipment, and the amount received for the use of its cars by other companies in excess of the amount paid out by it for the use of cars of said other companies, were all parts of the gross earnings.

It is argued by appellee that it has been held in *State* v. *Minnesota Railway Co.* 106 Minn. 176, *Union Pacific Railroad Co.* v. *United States,* 99 U. S. 402, and *In re Atchison, Topeka and Santa Fe Railroad Co.* 7 I. C. C. Reps. 61, that a railroad company need not charge itself for hauling its own supplies, and that the same reasoning should apply to hauling the supplies for the non-charter companies here or for traffic arrangements with independent companies, by which they would "exchange work," as it were, without actually paying over to each other any money for the services performed by the one for the other. The question of hauling the charter line supplies of appellee is not in this case, and hence these authorities on that point need not be considered. We think, however, that there is a very clear distinction, on principle, between the appellee hauling its own charter line supplies and in making arrangements by which it hauls supplies for the non-charter branches or for

independent companies. In this connection counsel for appellee cite and rely on *State* v. *Northwestern Telephone Exchange Co.* 120 N. W. Rep. (Minn.) 534, which holds that in fixing a tax on the gross earnings the State could not compel the telephone company to include as a part of its gross earnings telephone service to certain municipal corporations, public officials and charitable institutions, which, if charged at the current rate for similar services, would have amounted to $13,275, said services having been furnished free and the telephone company not having received, or expected to receive, anything of value therefor. It will be noted that the term used in that case was "gross earnings" and not "gross receipts," and it is therefore clearly distinguishable, for that and other reasons, from the charter provisions here being considered.

In dividing the joint earnings between the charter and non-charter lines, appellee insists that the charter lines and non-charter lines are separate and distinct and must be treated precisely the same as if they were owned by different companies, and we agree with it on that contention; but when it comes to the payment of operating expenses, the appellee seems to argue that the charter lines and non-charter lines shall be treated as one system. They must be treated as independent lines not only in the division of earnings but in the payment of expenses. If the contention of appellee be sound that it need not pay a percentum to the State for services for which no earnings were collected or received in fact, appellee, by traffic agreements for exchange between charter lines and independent corporations, could wipe out a large part of its gross receipts upon which the charter requires it to pay the State's percentum. Clearly this was not the intention of the framers of the charter.

The argument is further made by appellee that the use of the charter lines for the benefit of non-charter lines is more than offset by addition to the charter line business,

and that the methods of business employed, as alleged in the bill, between the charter and non-charter lines have resulted in great benefit to the State, as shown by a comparison between the amount paid to the State in 1878 and the amount paid in 1906. The fact that the charter line gross receipts have increased during these years does not prove that its traffic has been increased by those particular business methods. The total gross receipts from the charter lines may have increased in spite of, and not because of, the free use of the charter line terminal facilities and the free transportation for the benefit of the non-charter lines. Many changes in business affairs and conditions during the last thirty years, such as increase in population and wealth in this and surrounding States, must necessarily have added to the business of the charter lines. However, this is not a question of increase of the business of the charter lines or good faith on the part of the management of appellee, but rather as to the plain meaning of the words "total receipts," as used in the charter. The free use of these charter line depots, cars and engines, as alleged in the bill, has meant the saving, annually, to the non-charter lines of thousands, if not hundreds of thousands, of dollars. The annual revenue that comes into the appellee's treasury from the non-charter lines would therefore be greatly increased. When the expense of the non-charter lines is decreased their net earnings are increased to that extent. Both the charter and non-charter lines are owned by appellee. It needs no argument to show that such traffic arrangements would necessarily be a benefit to appellee by lessening the amount upon which it would pay the State's percentum.

We are disposed to uphold the contention of the State that the gross receipts from the charter lines means the total receipts received by them before anything is deducted for the expenses of management. This in no way interferes with the control and management of the road by its board of directors as authorized under the charter,

but simply furnishes a standard by which to measure the State's percentum. Appellee must pay the seven per cent on the total proceeds, including not only the proceeds actually received but those that should be credited to the charter lines as a fair remuneration for the services they are performing for the non-charter lines in granting the use of their terminal facilities, cars, engines, and all other services that the bill alleges have been thus furnished free to said non-charter lines. Demurrers 14, 19, 21 and 22 should be overruled.

### Receipts from Eating Houses and Dining Cars.

The State further claims that it should receive a percentum on the total receipts derived from eating houses and dining cars operated upon and along the charter lines. The bill alleges, in substance, that since 1877 appellee has owned and operated various eating houses and hotels on the charter lines, and in connection therewith, for the use and accommodation of charter line patrons, and has operated certain dining cars upon the charter lines for the same purpose, and has during each year received from both these sources large sums of money, the exact amount of which is to the State unknown. Appellee first suggests on this point that these hotels and dining cars are not within its charter authority. In *Chicago, Milwaukee and St. Paul Railway Co.* v. *Supervisors,* 48 Wis. 666, the court held that where it appeared that it was necessary for the accommodation of persons traveling upon a certain railway that the railway should maintain lodging houses, the erection and control of such lodging houses were within the charter powers of said railway company. In *Abraham* v. *Oregon and California Railroad Co.* 37 Ore. 495, it was held that a railroad company might, under some circumstances, conduct hotels and eating houses as a necessary part of its business and that their maintenance might be a legitimate railroad purpose; that whether a certain hotel

or eating house was maintained for such purpose was a mixed question of law and fact, ordinarily requiring tes- ·timony for its determination. The court held in *State* v. *Baltimore and Ohio Railroad Co.* 48 Md. 49, that the charter of that railroad company did not authorize it to. conduct hotels in the ordinary manner in which hotels are kept for the accommodation of the public generally, but that as the charter was not for merely a local railway but authorized the construction of a road from Baltimore to the Ohio river, designed and used as "one of the great through routes to the west, hotels, then, or buildings for the ac- commodation of passengers over the road, we think neces- sary to its business and therefore within its charter." This court, in discussing the powers of the appellee company, has held that freight houses and elevators constructed and used solely for the purpose of enabling the company to per- form its duty as a common carrier were within its charter powers. (*People* v. *Illinois Central Railroad Co.* 233 Ill. 378; *Illinois Central Railroad Co.* v. *People,* 119 id. 137; *Illinois Central Railroad Co.* v. *Irvin, 72* id. 452.) ˙Dining cars and hotels for the use of charter line patrons are necessarily incident to its business and therefore within its charter powers.

Counsel for the appellee further insist that the receipts from dining cars and eating houses are not fairly included within the provisions of the charter as to paying the per- centage to the State. What is meant by gross receipts has been ˙heretofore fully considered in this opinion· and the discussion need not be repeated here. The contention of appellee is, that if the gross receipts include the returns from dining cars and hotels, it would be compelled to pay to the State a percentum on the cost of the raw materials purchased for the use of these eating houses and dining cars, and that this was never intended by the charter. The same argument might be urged against the payment of a percentum on the total gross receipts for carrying freight

over the charter lines without first deducting the cost of the raw material that goes into fuel, rails, cars and engines. The argument of appellee on this point seems to assume that appellee furnishes free of charge, to its dining car and eating house patrons, all services in preparing and serving the food. This assumption is, of course, incorrect.

As the pleadings now stand, we are disposed to hold that the receipts from dining cars and eating houses, so far as derived from the patrons of the charter lines, should be included in the total receipts for computing the State's percentum. Demurrer No. 16 should be overruled.

### Newspaper Advertising.

The State further claims that appellee has issued mileage books for advertising and printing and has wrongfully deducted the expenses paid in this manner from the gross receipts of the charter lines before the State's percentum was computed. The principal argument of counsel for appellee in answer to this claim is, that the allegations of the bill are not sufficiently specific to justify the opening up of stated accounts. As that question is not now in the case, it needs only to be said that the allegations in question are sufficient to require an accounting.

Counsel for appellee further urge on this question some of the same arguments that we have considered with reference to the free use of the charter line property for the benefit of non-charter lines,—that is, that this advertising was for the purpose of increasing the business of the charter lines, and the free mileage, therefore, should not be considered a part of the gross income. What has already been said in this opinion on other branches of this case covers this argument of appellee.

It is further suggested by appellee in opposition to this claim, that the allegations of the bill do not show that this advertising was of any value to the charter lines. If this be true it certainly would be poor business judgment to is-

sue mileage books therefor. Under the allegations of the
bill these mileage books were used on the charter lines to
pay for an expense which would otherwise have had to be
paid in cash, and the services rendered to holders of these
books, if rendered to the general traveling public, would
have resulted in increased receipts to the company for the
transportation furnished. They appear to have been cred-
ited by appellee to the advertising account. These amounts
should be included in the total receipts upon which the
State's percentum is estimated. Demurrer No. 17 should
be overruled.

### Rentals for the use of Rolling Stock of Appellee received from Independent Railroads.

The bill further alleges that the State should have been
paid a percentum on certain rentals paid by other railroads
to appellee for the use of charter line cars and other rolling
stock. It is first objected to this claim that the bill does
not allege that the cars were not the property equally of the
charter and non-charter lines. This contention cannot be
sustained.

It is next urged by appellee that it should be assumed
by the court, on these allegations, that the use of these
charter line cars by independent railroads was offset by
rentals paid by appellee for the use of cars belonging to
these other railroads; that it is common knowledge that
railroads interchange cars under an arrangement by which
the cars of one company go upon the tracks of another in
exchange for the use of the other company's cars. There
is nothing in the record to indicate that such a practice of
interchanging cars exists. The court cannot take judicial
notice of such practice. If on a hearing it be shown that
there has been an interchange of cars between charter lines
of this company and other railroads, then, up to the point
where the amounts balance, the operation is a mere ex-
change of the use of cars, but if appellee receives from

any company rental for the use of its cars in excess of the amount paid out by it, then such excess should be made a part of the receipts by which to measure the State's percentum. (*State* v. *McFetridge,* 64 Wis. 130; *State* v. *Minnesota and International Railway Co.* 106 Minn. 176.) Demurrer No. 20 should have been overruled.

### Mobile and Ohio Railroad.

The claim of the State with reference to a share of certain rentals paid by the Mobile and Ohio Railroad Company as the result of an agreement for the use of said charter line tracks and terminal facilities in the city of Cairo is similar in character to the claim last considered. The use of the Cairo bridge by this same railroad is also very similar to the questions affecting the Cairo bridge arbitrary. What we say on these and other subjects in the opinion will sufficiently cover these questions as raised here with reference to the Mobile and Ohio railroad without again reviewing the rules of law applicable thereto. Under the allegations of the bill it appears as if some of these rentals should properly be included in the total receipts of appellee upon which the State was entitled to its percentum, but if we understand the allegations of the bill on the question of the use of the Cairo bridge by this railroad, the rentals as to the Cairo bridge should not be included in the total proceeds. Upon the appellee, however, is cast the burden of showing the exact situation for the years 1905 and 1906. Demurrer No. 9 should therefore be overruled.

### Shipments by Cairo and Mounds.

The State further claims that appellee, in moving its general freight traffic from a point south of the Ohio river, has carried much of it over a portion of the charter lines without crediting anything to the total receipts of said charter lines and paying the State's percentum thereon. It appears that Mounds is a station or junction upon the charter lines some nine miles north of Cairo; that all freight

from south of the Ohio river destined for St. Louis is billed to Mounds; that this freight is transferred over the charter lines a distance of nine miles; that all freight from points south of the Ohio river to Cairo is transported over the bridge to Cairo Junction, where the bridge ends, and then south over the old charter lines direct to Cairo; that nothing is credited to the charter lines for the transportation over said nine miles to Mounds or over said five miles to Cairo. Appellee's answer to this claim is, that the bill on this point is not sufficiently specific; that the questions of inter-State commerce and of joint earnings by mileage are involved. In view of what has been said heretofore on these various subjects, appellee should be required to account on a just and equitable basis for these five and nine mile hauls over charter lines and pay to the State a per centum thereon for said years 1905 and 1906. Demurrer No. 28 should be overruled.

## Rebates.

The State makes the further claim that appellee, for the purpose of cheating and defrauding the State, has from time to time allowed to certain of its patrons rebates as fictitious claims, deducting them from charter line receipts before the State's percentum was paid. If these rebates were unlawful or fictitious, clearly they were improperly deducted. All rebates are not necessarily unlawful. In *C., N. O. & T. P. Ry. Co.* v. *Inter-State Commerce Commission,* 162 U. S. 184, it was said (p. 197): "Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable and that they shall not unjustly discriminate so as to give undue preference or advantage or subject to undue prejudice or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests

upon the same principles which are regarded as sound and adopted in other trades and pursuits." This was quoted with approval by this court in *Kirby* v. *Chicago and Alton Railroad Co.* 242 Ill. 418. A special rate or rebate is not always unjustly discriminatory. (2 Hutchinson on Carriers,—3d ed.—sec. 589; *Christie* v. *Missouri Pacific Railroad Co.* 94 Mo. 453; *Stewart* v. *Lehigh Valley Railroad Co.* 38 N. J. 505; *K. P. Railway Co.* v. *Bayles,* 19 Colo. 348.) Premiums unearned by domestic insurance companies and paid in advance but refunded upon the cancellation of policies have been held not to be included as a part of the entire or gross receipts of the insurance company. (*German Alliance Ins. Co.* v. *VanCleave,* 191 Ill. 410; *People* v. *Miller,* 177 N. Y. 515.) Certain customers having telephones were charged on the books with the regular price of the telephones and then credited with a discount, as had been agreed upon between the telephone company and the customers, and certain rebates were also made for interrupted service or failure to render service already charged for. It was held that such rebates and discounts should not be included as a part of the gross earnings of the telephone company. (*State* v. *Northwestern Telephone Exchange Co.* 120 N. W. Rep. [Minn.] 534.) Under the allegations of this bill we think it is incumbent upon appellee to show whether or not the rebates in question were lawful. If they were, and the agreements on which they were based were entered into in good faith by appellee, we do not think they should be included in the gross receipts, as that phrase is used in appellee's charter. Demurrer No. 27 should be overruled.

### Interest on Deposits.

The State claims that appellee has received, in interest upon charter line funds deposited in bank, large sums of money which should have been included every six months in appellee's account of charter line receipts but were not so included. In the bill the State claimed that it was en-

titled to have a percentum on the income from investments in securities of other corporations made from surplus earnings or dividends of the charter lines. On oral argument the Attorney General abandoned this claim, as he did the claims as to income from the Chicago and Cairo elevators and the building at 58 Michigan avenue, Chicago. On principle we do not see any real distinction between the interest that may be earned for every six months' period on deposits or loans of the charter line funds and the income derived from the investment of surplus earnings or dividends of said charter lines, so far as the State's percentum is concerned. In our judgment the interest on the deposits or loans of the charter line funds was not intended to be included in the total receipts derived from said charter lines and branches for measuring the State's percentum. Demurrer 25 was properly sustained. Demurrers 11, 18, 23 and 24 should also be sustained.

### Diversion of Traffic.

The State further claims, and the bill alleges, that appellee, for the purpose of cheating and defrauding the State and minimizing and reducing the gross receipts of the charter lines, diverted a large quantity of freight from charter lines to non-charter lines and transported the same over non-charter lines; that in every instance the freight, if carried by the shortest route, would have been carried over the charter lines, and that from the traffic so diverted to the non-charter lines appellee collected and received at least two million dollars. The appellee has the undoubted right, in the management of its business, to ship goods over any line of its railroad. Under the allegations of the bill on this subject demurrer No. 15 should be sustained.

### Cairo Bridge.

The bill alleges that improper deductions have been made for transportation across the Cairo bridge before the

fixing of the amount upon which the State's percentum was paid. It appears from the bill that by congressional acts in 1872 and 1883 certain persons or corporations were authorized to erect bridges across the Ohio river for railroad and other purposes, the acts being duly accepted by the Chicago, St. Louis and New Orleans Railroad Company, which owned a line of railroad from the south bank of the Ohio river to New Orleans; that appellee and the said last named railroad company induced the legislature of Kentucky to pass an act to authorize them, jointly or separately, to build and maintain a railroad bridge across the Ohio river, including the necessary approaches and embankments, from Cairo, Illinois, to a point in Kentucky opposite; that said railroad company and appellee began in the year 1887 and completed in 1889 the construction of a bridge; that all of that part of the bridge south of the north-western shore of the Ohio river is in Kentucky and the balance in Illinois; that the bridge is 104 feet above low water and 3.87 miles in length; that the part of said bridge which spans the Ohio river proper is about three-fourths of a mile in length and entirely in Kentucky; that the northern approach, entirely in Illinois, is about 1.6 miles long, of which about one mile was originally constructed of wood and the balance of iron and steel, the wooden part having been displaced by an earth embankment 15 feet above the natural surface of the ground at its northern end and 50 feet above the natural surface and 185 feet wide at the base at its southern end, where it connects with the iron and steel frame; that the Illinois part of the bridge was constructed by appellee and cost $500,-000; that the part in Kentucky ostensibly constructed by the Chicago, St. Louis and New Orleans Railroad Company was, in fact, constructed by the appellee; that at and prior to the time the bridge was built appellee owned all the capital stock and bonds of said railroad company; that the total cost of the bridge was about $3,000,000, and that

appellee was at the time of the completion, and now is, the equitable owner of that part in Kentucky; that June 1, 1890, appellee entered into a pretended lease with the Chicago, St. Louis and New Orleans Railroad Company · for that part of the bridge in Kentucky for 392 years, at an annual rental of $180,000, since which time appellee has used and operated said bridge as a part of its line of railroad. It is further averred that ever since June, 1890, appellee has uniformly deducted an arbitrary charge of two cents per hundred pounds on all freight and an arbitrary charge of twenty-five cents for each passenger transported over said Cairo bridge, which "bridge arbitraries" have been deducted from the aggregate freight and passenger receipts of the charter lines and the non-charter lines south of the Ohio river before said receipts were apportioned between the charter and non-charter lines; that in making rates for the transportation of freight and passengers between points north and points south of the Ohio river over its lines, appellee included nothing on account of bridge arbitraries.

It is contended by counsel for the State that one-half of the money collected for these "bridge arbitraries" should be included in the total receipts upon which the State's per-centum is required to be paid; that because of the equitable ownership of that part of said bridge in Kentucky and its failure to add said arbitraries to the rates, the mileage of said bridge should be treated by appellee, in the division of the receipts, as any other equal mileage of its railroad. There is some discussion in the briefs as to whether the fact that the part of the bridge in Kentucky is owned technically by another corporation makes any difference in the right to charge the bridge arbitrary. Passing for the moment that question, let us consider whether if an independent corporation owned this bridge it would have a right to charge this bridge arbitrary. This involves a question similar to the one we have already considered

as to the division of joint earnings of the charter and non-charter lines on the mileage basis.

In considering the reasonableness of rates and the grounds upon which they should be fixed, in *Smyth* v. *Ames,* 169 U. S. 466, the court said (p. 546) : "We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used for the convenience of the public, and in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." Where different rates were prescribed for railroads on the upper and lower peninsulas of Michigan this difference was held proper, the court saying that it would take judicial knowledge that the cost of building and running railroads was greater in the upper peninsula than in the lower. (*Wellman* v. *Railway Co.* 83 Mich. 592.) The authorities seem to hold that where a road or a part of a road is built through a mountainous country or other region which requires expensive construction, the charge may be greater than on other portions of the road, or other roads, where the cost of construction per mile is less. Beale & Wyman on Railroad Rate Regula-

tion, secs. 458, 920.   See, also, *Covington and Louisville Turnpike Co.* v. *Sanford,* 164 U. S. 578; *Inter-State ·Commerce Commission* v. *Lehigh Valley Railroad Co.* 74 Fed. Rep. 784; *Ames* v. *Union Pacific Railway Co.* 64 id. 165; *Louisville and Nashville Railroad Co.* v. *Brown,* 123 id. 946.

In *Freight Bureau* v. *C., N. O. & T. P. Ry. Co.* 7 I. C. C. Reps. 180, the commission stated (p. 184) : "The Ohio river has usually been recognized as a barrier, the crossing of which entailed an unusual expense upon traffic. As a rule the bridges across that river are not owned by the railway companies controlling the traffic there to the north or to the south, but were originally constructed and are still owned by independent companies.   In some instances these companies transfer the traffic themselves, but usually they lease the bridge to the carrier.   This has occasioned an extra charge upon all freight crossing the river. * * *   All tariffs have recognized this fact in the allowance of 'an arbitrary' for crossing that river and in making the freight rate to Cincinnati and Louisville from the north or from the south.   Nor is this an unreasonable charge. * * *   It is said that this ought not to be a factor in the case of the Queen and Crescent line, for the reason that it owns the bridge at Cincinnati and therefore pays no toll; but that bridge must have cost something to build and must cost something to maintain, and does entail an actual additional expense, which is fairly measured by the toll paid in other cases, unless that is excessive."

In *Commercial Club* v. *Chicago and Northwestern Railway Co.* 7 I. C. C. Reps. 386, the commission had under consideration an extra charge for the bridge across the Missouri river between Council Bluffs and Omaha, and after referring with approval to the decision just cited, said (p. 405) : "While Omaha is, in fact, only three miles west of Council Bluffs, the bridge which connects the two cities is equivalent—having reference to the cost of construction and maintaining it—to many miles of ordinary railroad.

Two of the defendants actually pay $45,000 a year for the right to operate their trains across this bridge. It is idle to say, therefore, that the carrier ought not, having reference to the cost of service, to receive any more from the carriage from Omaha than from Council Bluffs."

Beyond doubt, if that part of the bridge in Kentucky were owned by an independent corporation, a reasonable separate charge for traffic across the bridge could be made. We have held in this opinion that the division of joint earnings between the charter and non-charter lines need not necessarily be on a mileage basis. It follows that if the appellee company directly owned and controlled the bridge in question, as we understand it does the non-charter lines in Illinois, the joint earnings of the bridge company and the charter lines would not be required, in equity and justice, to be divided on a mileage basis. Surely the case for the State is no stronger when the bridge corporation is equitably owned and controlled by appellee than if it were actually owned, and the legal title held, by it.

Prior to the construction of the Cairo bridge, freight was transported across the Ohio river by boat, the operation of which was no part of the charter authority of appellee. (*Illinois Central Railroad Co.* v. *Irvin,* 72 Ill. 452.) That part of the bridge over the river proper, together with its approaches, cost $3,000,000. It seems to be conceded in the argument that this was a much larger cost per mile than the construction of an ordinary mile of the charter lines. We are inclined to hold that if the bridge arbitrary charged is shown to be a reasonable one for an independent corporation it must be a reasonable one under the circumstances set forth in the bill. The burden of proof, however, necessarily rests upon appellee, on account of its relation to the corporation owning and controlling the bridge, to show that such a charge was fair and reasonable, and this, too, in this litigation, even though the relation between the State and appellee was not such as

required the utmost good faith on the part of the appellee towards the State.

It is further contended by counsel for the State that if appellee is entitled to deduct a bridge arbitrary, then it should credit to the charter line receipts such proportion of the bridge arbitrary as the length of the bridge in Illinois, to-wit, the approach, bears to the whole length of the bridge, including the approaches, which the State insists are part of the bridge. Appellee contends that the approaches are not parts of the bridge and that all the bridge is in Kentucky. Under the common law, and usually under the statutes in this country, a bridge includes the abutments and approaches, which make it accessible and convenient for public travel. (*King* v. *York,* 7 East, 588; *Board of Sussex County* v. *Strader,* 18 N. J. L. 108; *Tinkham* v. *Town of Stockbridge,* 64 Vt. 480; *United States* v. *C. & M. V. Railroad Co.* 134 Fed. Rep. 353; 5 Cyc. 1053, and cases cited; 4 Am. & Eng. Ency. of Law,—2d ed.— p. 919, and cases cited.) It has been held in some cases that whether the bridge includes the approaches depends on the circumstances in which the word is used. (*Nims* v. *Boone County,* 66 Iowa, 272; *Commonwealth* v. *Deerfield,* 88 Mass. 449.) However, the precise question to be decided here does not depend upon whether the northern approach is necessarily a part of the bridge, but whether it was intended that the bridge arbitrary should be a charge for carrying traffic, not only over the Kentucky approach and that part of the bridge spanning the river proper, but over the northern approach as well. The Illinois approach, we have held, is a part of the charter lines. (*State Board of Equalization* v. *People,* 229 Ill. 430.) The fact that a lease of the bridge was made at an annual rental of $180,000 would tend to prove that if the sum total of the bridge arbitraries exceeded in any given year that amount they would be unreasonable. On the hearing, if appellee shows that the charge is in good faith made solely for traffic over

that part of the bridge, and the approach, in Kentucky, and that such charge is reasonable, then the State is not entitled to charge a percentum on any part of the bridge arbitrary. If, however, the bridge arbitrary is shown to be, in part, a charge for carrying traffic over the approach in Illinois, then the State is entitled to a percentum on a part of such bridge arbitrary. The division of the bridge arbitrary between the Illinois approach and the part of the bridge in Kentucky should be made on a fair and equitable basis, taking into consideration the original cost of the northern approach as compared with the cost of the remaining portion of the bridge, and taking into consideration also the cost of keeping said northern approach in repair as compared with the cost of keeping in repair the remainder of the bridge, and all other factors that the proof shows should be considered in order to reach the fair proportion of said bridge arbitrary that would be earned by carrying said traffic over the northern approach. The reasoning in this opinion with reference to the division of joint earnings applies with equal force to the division of the bridge arbitrary between the northern approach of said bridge and that part of the bridge in the State of Kentucky. The burden is upon the appellee to show the exact situation on these questions. Demurrer No. 8 should be overruled.

### Dubuque Bridge.

The bill further alleges that the Dunleith and Dubuque Bridge Company, acting under authority of Congress and the laws of Illinois and Iowa, constructed a railroad bridge across the Mississippi river between the city of Dubuque, in Iowa, and the town of Dunleith, in Illinois, which was opened for traffic in 1869; that the authorized capital stock of said bridge company was $1,000,000, of which $300,000 was subscribed by appellee; that shortly after the construction of said bridge, and prior to 1878, appellee purchased all the stock of said bridge company, and thereby became,

and now is, the equitable owner of said bridge; that in
1867 (before the bridge was opened) appellee entered into
a pretended lease with said bridge company for the leasing
of said bridge by appellee in perpetuity at an annual rental
of $150,000; that since the completion of said bridge ap-
pellee has used and operated the same as a part of its line
of railroad.   The bill further alleges that from Novem-
ber 30, 1877, to November 30, 1899, appellee deducted an
arbitrary charge of two cents per hundred pounds on all
freight and an arbitrary charge of twenty-five cents for
each passenger transported over said bridge up to $150,000
a year, and no more; that from November 30, 1899, to
October 31, 1905, appellee charged and deducted bridge
arbitraries, not only up to $150,000 a year, the amount of
the rental, but upon all freight and passenger traffic trans-
ported over said bridge; that since October, 1905, appellee
has annually deducted only said sum of $150,000.

It is contended by the State in this matter, as it was
concerning the Cairo bridge, that one-half of these bridge
arbitraries should not be deducted, in whole or in part,
from the total proceeds received by appellee, before fixing
the State's percentum.   In the case of this bridge there is
no question as to an approach.   The charter line ends at
Dunleith, (now known as East Dubuque,) and the bridge
begins at that point.   What we have said in discussing the
law as to the bridge arbitraries over the Cairo bridge ap-
plies with equal force here and need not be repeated.   There
is this difference, however, in the facts between the two
bridges:   the bill alleges that appellee, when it entered into
the lease for the Cairo bridge with the company that built
that bridge, owned the majority of the bridge company
stock, while as to the Dubuque bridge the bill alleges that
when the lease was made with the bridge company appel-
lee owned less than one-third of the stock of said bridge
company.   Under such circumstances the appellee would be
held to stricter proof to show that the lease for the Cairo

bridge was made in good faith than it would as to the lease for the Dubuque bridge. Whether as to this latter bridge appellee has a right to charge arbitraries in excess of $150,000 rental depends somewhat on the question whether a charge in excess of that rental would be a fair and reasonable charge for carrying the traffic across it if an independent company owned the bridge. The fact that appellee is now the equitable owner of the stock in the said bridge company would not change the situation except in so far as it would require stricter proof, the burden resting upon it, to show that any such charge was reasonable and fair and made in good faith. The fact that appellee only deducted $150,000 for the year 1906 for the bridge arbitraries as to this bridge and deducted a larger amount for the years previous, including the year 1905, would tend to indicate that the additional charge for 1905 and previous years was not made in good faith. Appellee is required by the allegations of this bill to show, for the years 1905 and 1906, what is a fair and equitable charge for this bridge arbitrary. Demurrer No. 10 should be overruled.

---

Counsel for appellee contend that the court should interpret the requirements of appellee's charter on the disputed questions in the light of the construction placed thereon by the parties themselves since the charter went into force. The argument is, that the division of the joint earnings between the charter and non-charter lines, the method of paying for advertising, the question as to bridge arbitraries, and other matters, have been settled and disposed of in a certain manner during all of these years, and that such practical construction should control the courts at the present time. Whenever a question is in a degree doubtful or open to reasonable debate the case is held to be a proper one for the application of the doctrine of contemporaneous and practical construction, but when there is no ambiguity in the statute that doctrine is without force.

(*Whittemore* v. *People,* 227 Ill. 453.) "Long usage is of no avail against a plain statute. It can be binding only as the interpreter of a doubtful statute and as affording a contemporary exposition." (2 Lewis' Sutherland on Stat. Const. sec. 473.) "When no ambiguity or doubt appears in the law we think the same rule obtains here as in other cases, that the court should confine its attention to the law, and not allow intrinsic circumstances to introduce a difficulty where the language is plain. To allow force to a practical construction in such a case would be to suffer manifest perversions to defeat the evident purpose of the law-maker." (Cooley's Const. Lim.—5th ed.—p. 83.) We have already considered the bearing of this doctrine on the question of a division of the joint earnings between the charter and non-charter lines. On the other questions in this case where counsel for appellee wish to apply this doctrine we think the charter is plain and unambiguous, and therefore appellee cannot invoke this rule of law.

The bill has attached to it seventy-four interrogatories, whereby it asks that certain information be furnished to the State. Appellee filed demurrer No. 29 to this portion of the bill and interrogatories attached, setting up that no fact or circumstance is offered showing that the information demanded is essential or indispensable to the State or that such information could not be obtained otherwise than by answers of appellee or its agents, and further, that the information could only be furnished by tedious, laborious and expensive investigation on the part of appellee. Under section 23 of the Chancery act appellee should be required to answer these interrogatories and give the information that is germane to those averments of the bill which we have held sufficient to justify an accounting for the years 1905 and 1906. The demurrer should therefore be overruled.

Not only is it the duty of appellee to furnish the information sought by these interrogatories, but its officials should be both willing and anxious to take advantage of

the opportunity to furnish that information. We have heretofore stated that good faith was required on the part of the State in dealing with appellee with reference to the settled accounts. Absolute good faith is alike required on the part of appellee. It is frequently charged that "corporations have no souls." While this may be true as to the corporate entities themselves, it should not be true as to the men who manage and control them. In this day, when a large part of the business of the country and of the world is owned and carried on by corporations, the highest interests of the corporations require on the part of their officials every effort to convince the public that the corporations are obeying the law and keeping within their charter powers. This applies with special force to appellee in its dealings with the State. Appellee was granted rights and privileges that have proved most valuable. In return for those privileges, equity and justice require that it should fully live up to its charter requirements. While the common interests of both appellee and the State demand that each should treat the other fairly, their relations under this charter necessarily require that appellee, in reporting the gross receipts and adjusting and settling the State's percentum, should act towards the State with the utmost good faith. In making these semi-annual reports its officials should honestly attempt to credit to the State every dollar of revenue required by its charter.

So many different questions have been raised by the pleadings and briefs that it is possible some comparatively minor ones have not been taken up and considered in this opinion. We have endeavored, however, to give the main points at issue the consideration their importance and far-reaching effect required, and especially to construe those provisions of the charter as to which, as we understand, questions are raised by the allegations of the bill. What has been here said will, in our judgment, serve as a reasonably comprehensive guide to the trial court in such further

246—19

proceedings as may be required in this suit, and also to the officials of the State and of appellee, in future settlements, as to the revenue to be paid to the State. In the present state of the pleadings, before any evidence is heard, to attempt to give more specific directions for future proceedings than are found in this opinion might mislead rather than assist in the trial of the case. The case has been fully and ably presented by distinguished counsel. The briefs and arguments in many respects might well serve as models. They have been of great assistance in the investigation of the complicated matters involved in this litigation. Every subject has been so exhaustively presented that practically nothing could be added, and yet so well arranged, indexed and condensed that no unnecessary labor was required to understand fully the questions in dispute.

The conclusions reached in this opinion require further proceedings in the circuit court. The decree of that court is accordingly reversed and the cause remanded for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*

Mr. JUSTICE HAND, specially concurring:

I concur in the opinion of Mr. Justice Carter (concurred in by Justices Cartwright and Dunn) except in so far as it holds that the semi-annual statements filed by the appellee prior to the year 1905 with the Governor are stated and settled accounts which are binding upon the appellant, and back of which the State cannot go, in the accounting held to be proper between the State and the railroad company, upon the remandment of this cause. As to that part of the opinion I do not concur but most respectfully dissent.

In my opinion the Governor, in "verifying and ascertaining the accuracy" of the accounts filed with him by the railroad company, does not exercise judicial powers, but acts, in so doing, only as the agent of the State, and that the Governor's powers, as such agent of the State, are lim-

ited to a verification and ascertainment of the accuracy of the accounts filed with him by the railroad company; that while he may call for books and papers and may examine witnesses for the purpose of informing himself as to the accuracy of the accounts filed with him by the railroad company, he has no power to go outside of the accounts filed and bind the State by adjudicating upon and determining matters adversely to the State which have never been submitted to him by the railroad company and which are not included within the scope and purview of the accounts presented by the railroad company and submitted to him for examination.   (*Kinney* v. *People,* 3 Scam. 357.)   The powers of the Governor in this particular are contained in the following provision of the charter of the railroad company: "For the purpose of ascertaining the proceeds, receipts or income aforesaid, an accurate account shall be kept by said company, a copy whereof shall be furnished to the Governor of the State of Illinois," and for the "purpose of verifying and ascertaining the accuracy of such account, full power is hereby vested in the Governor," etc. The opinion (concurred in by Justices Carter, Cartwright and Dunn,) holds that a *quasi* fiduciary relation exists between the railroad company and the State; that the knowledge of the amount of the gross earnings of the railroad company rests entirely in the railroad company, and that the duty is cast upon the railroad company to file with the Governor a true and correct account of its gross earnings. With this holding I fully agree, but, after such holding has been made, for the court to then hold that after the railroad company has filed its accounts the Governor may not rely upon their truthfulness but that it is his duty to investigate their truthfulness and accuracy, and if he fails to make such investigation, or if he does make such investigation and fails to discover their untruthfulness, the State is bound, not only by what the accounts show upon their face, but by other matters which have been concealed from the Gov-

ernor or have been omitted from the accounts, is, to my mind, illogical, and inconsistent with the view that the duty rests upon the railroad company to furnish to the Governor a truthful and accurate account of its gross earnings. If, however, it is correct to hold, as does the majority opinion, (which is concurred in ·by all the justices other than myself,) that the accounts filed prior to 1905 are accounts stated and binding upon the State, then I insist that all the accounts filed by the railroad company prior to that date are impeached upon the face of this record, and that they may rightfully be opened up and the State allowed to recover seven percentum upon all ·items omitted by the railroad company in making up said accounts.

An account stated amounts only to *prima facie* evidence that a settlement has been had between the parties to the accounting and a balance struck, and the account may be opened up for fraud or mistake or by showing that *any existing item* was not incorporated into the account at the time the account was stated and the balance struck. (*Kinney* v. *People, supra; Beebe* v. *Smith,* 194 Ill. 634.) It is averred in the bill, and admitted by the demurrer, that millions of dollars earned on inter-State business, for drayage, for free use of the charter lines, from eating houses and in the dining car service, for newspaper advertising, rebates, etc., have not been included in the accounts filed by the railroad company with the Governor, and the majority opinion holds that the railroad company should have included these numerous items in its accounts filed with the Governor. The copies of the accounts incorporated in the majority opinion show upon their face that all these items have been, from the beginning, omitted from the accounts filed with the Governor by the railroad company. These items having been omitted and it being conceded that the railroad company owes to the State seven percentum of the aggregate of these items, which, as a whole, amount to a vast sum, I am unable to understand the force of any

course of reasoning which bars the State from the right to recover the specified percentum admittedly due it upon the aggregate of these items. The only attempt to justify the holding of the majority opinion in this particular is, that the averments of the bill as to these omitted items are not sufficiently specific, and that the omitted items do not, in law, constitute separate items.

As to the first point, the averments of the bill, I think, are certain and specific. To demonstrate this, I challenge attention to the averment with reference to the item of eating houses and dining car service, which is in the following language:

"That during the period from October 31, 1877, to October 31, 1906, the defendant owned and conducted various eating houses, restaurants and hotels upon and along its said charter lines for the use and accommodation of the patrons of its said charter lines, and which said eating houses, restaurants and hotels were conducted by the defendant in connection with the operation of its said charter lines, and during all of said time the defendant received from the patrons of said eating houses, hotels and restaurants, each year, large sums of money, the exact amount of which is to your orator unknown; that during the period last aforesaid the defendant operated on its said charter lines certain dining cars for the purpose of furnishing to the patrons of its charter lines meals, food and drink, and during each year of the period last aforesaid received therefor large sums of money, the exact amount of which is to your orator unknown, but your orator is informed and believes, and therefore charges the fact to be, that during the period last aforesaid the said defendant received from the operation of its said eating houses, restaurants, hotels and dining cars divers sums of money, amounting in all to, to-wit, the sum of $1,500,000; that such sums were a part of the total or gross proceeds, receipts or income derived from said charter lines, and it was the duty of the defendant to report the

same to the Governor of your orator as part of the proceeds, receipts or income of said charter lines, yet your orator says that the defendant, for the purpose of cheating and defrauding your orator and of minimizing and reducing the amount of such gross or total proceeds, receipts or income of said charter lines, fraudulently failed and neglected to report the said sums so received by it as aforesaid, and each of them, to the Governor of your orator, and that the defendant has never paid to your orator, or into the treasury of your orator, any percentum upon said sums, nor any of them, so fraudulently omitted by the defendant from its semi-annual statements heretofore made to the Governor of your orator; and so your orator says that the defendant is still indebted to your orator, on account thereof, in the sum of seven percentum on the said sum of $1,500,000."

And the averments of the bill with reference to the other designated omitted items are equally specific.

As to the second contention, the items of earnings from drayage, eating houses and dining car service, newspaper advertising, etc., form just as definite a basis upon which to base an accounting as do the items stated in the accounts filed, as will appear from the copies of the accounts incorporated in the majority opinion. It has never been the view of the railroad company that these omitted items were incorporated in the accounts filed by it with the Governor, but it has been, and is now, its claim that it was not required by law to incorporate these several omitted items into its accounts.

For the reasons stated I cannot agree to that part of Justice Carter's opinion which holds that by the failure of the railroad company to file full, accurate and truthful accounts, and the approval or non-approval of such accounts by the Governor, the vast amount of revenue due the State from the railroad company upon these omitted items has been lost to the State. The majority opinion holds the

State is entitled to seven percentum of the railroad company's earnings from these several omitted items, and it appears from the opinion that such percentum has not been paid.   I am unable to accede to the view that the doctrine of accounts stated applies, as between the State and the railroad company, to the accounts filed by the railroad company with the Governor, and think that the railroad company should be required in this suit to show that it has from the beginning fully and fairly accounted to and paid over to the State seven percentum upon its gross or total receipts or income for the entire time fixed by its charter for the payment of such percentum upon its gross earnings.

FARMER, J., VICKERS, C. J., and COOKE, J., specially concurring:

We do not disagree with the conclusions reached by the court in the determination of the rights of the respective parties to this litigation upon the material questions involved in so far as definite conclusions are set out in the opinion.   We do not, however, agree with all the discussion in the opinion, and without attempting to point out in detail all that is said with which we are not in accord, we feel compelled to say that we do not agree with what is said in discussing the question whether a fiduciary relation exists between the State and the Illinois Central Railroad Company.   What is said on that subject seems to us unnecessary to a determination of the case upon the issues presented by the record and to serve no useful purpose.   The court holds that no fiduciary relation exists, and with that holding we agree.   If, then, no such relation exists, it appears to us inconsistent to hold that the rules of evidence as to the burden of proof are just the same as if such relation did exist.   In our opinion, when the rights and relations of the parties are determined, the rules of evidence applicable in taking the account must necessarily be the rules applicable between any parties sustaining similar relations.

In other words, there being no fiduciary relation between the State and the railroad company, but their relations being contractual, the burden of supporting the allegations of the bill by proof, in our opinion, is on the State, and it is not incumbent upon the railroad company, in the first instance, to disprove them. We also think that in some respects the opinion is not as definite as it should be in order to be a safe guide for the court in trying the case.